UNITED STATES of America, Appellee,

v.

Teodoro ARIZA–IBARRA, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Alvaro RODRIGUEZ AMADOR, Defendant, Appellant.

Nos. 78–1125, 78–1229.

United States Court of Appeals, First Circuit.

Argued April 3, 1979.

Decided Sept. 20, 1979.

Michael A. Young, New York City, with whom Goldberger, Feldman & Dubin, New York City, was on brief for appellant Teodoro Ariza-Ibarra.

Carlos Perez Olivo, San Juan, P. R., on brief for appellant Alvaro Rodriguez Amador.

Justo Arenas Fernandez, Asst. U. S. Atty., San Juan, P. R., with whom Julio Morales Sanchez, U. S. Atty., San Juan, P. R., was on brief for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Teodoro Ariza-Ibarra, a Colombian, and Alvaro Rodriguez Amador, a Spanish citizen resident in Puerto Rico, were convicted by a jury in the federal district court of Puerto Rico of conspiracy to import 50,000 pounds of marijuana and 25 kilos of cocaine from Colombia into the United States. See 21 U.S.C. §§ 952(a), 963.

As portrayed by the prosecution, Ariza was a Colombia-based supplier of drugs, while Rodriguez—who dealt in vessels suitable for drug smuggling—was one of his lieutenants. Both defendants were arrest-

ed in the afternoon of January 31, 1978 at the international airport in San Juan. Their capture followed an undercover operation in which Drug Enforcement Administration (DEA) agents and an informer posed as would-be drug purchasers. Meeting with defendants on January 30 and 31, the undercover operatives made final arrangements to procure from them a shipment of Colombian cocaine, with a marijuana deal to follow. Before any part of the transaction was consummated defendants went to the airport; fearing that they were planning to depart, DEA agents arrested them. Defendants were not charged with commission of any substantive offense, but rather with the conspiracy to import that was allegedly hatched in the presence of the undercover operatives.

The prosecution's case was based largely on the testimony of a witness named Fortunato Jorge, a DEA agent stationed in Puerto Rico. Jorge testified that he learned about Ariza from an informer named Alberto Larain Mestre, with whom he had worked in the past. Beginning on November 30, 1977, Larain and Jorge, operating from Puerto Rico, undertook a series of telephone inquiries to Ariza and certain associates in Colombia and Miami, seeking to initiate meetings at which purchases of cocaine and marijuana could be arranged. Tapes of these calls, recorded by Jorge, were placed in evidence to corroborate Jorge's testimony of these initial contacts.[1] Jorge testified that face-to-face meetings, at which he as well as Larain were present, eventually also occurred, in Miami and Puerto Rico.[2] He recounted a meeting in Puerto Rico on board the vessel Wendy B, at which Rodriguez indicated his readiness to furnish drugs in concert with Ariza. The Wendy B, which was being reconditioned

with a new engine and larger fuel tanks, and other boats were to be made available to transport the drugs to Puerto Rico. Jorge also testified that he and Larain met with Ariza in Miami and Puerto Rico. They agreed that Ariza would furnish, with Rodriguez' assistance 25 kilos of cocaine at $25,000 a kilo, with a separate commission for Rodriguez. While this deal encompassed cocaine only, Jorge testified to an understanding that Ariza would later furnish 50,000 pounds of marijuana for $6,000,-000. Ariza insisted on a $300,000 down payment for the cocaine, to which Larain and Jorge finally agreed. It was while Larain and Jorge were stalling the delivery of the down payment that defendants went to the airport where they were arrested.

The tapes that went into evidence were of the preliminary telephone conversations with Ariza and his associates aimed at setting up the personal encounters later realized. The taped conversations were without express mention of drugs, but did give support to Jorge's testimony as to these preliminary contacts with Ariza. It was natural that Ariza and his associates would be wary of mentioning the true nature of the business on the telephone. Guarded references to "coffee" and "furniture" could well have been cover words for other substances, and the conversations were so deliberately cryptic as to suggest illicit rather than ordinary commercial dealings. Nonetheless, the tapes by themselves were ambivalent as to what defendants were up to. It was Jorge's testimony of what defendants said at the later, unrecorded, meetings that provided the government with its basic case.

Jorge's associate, the informer Larain, was not called as a witness by either the government or the defense.[3] But while

---

1. Many of the calls were made by Larain in Jorge's presence. Jorge testified that Larain authorized him to tape them.

2. These key meetings were not taped.

3. At one point during the trial, after defense counsel had objected to the testimony about Larain and said, "We are entitled to cross-examine that fellow," the prosecutor said, "You

can subpoena him." The record shows that defense counsel then said "Where?" and that there was no response. While the government did not then produce Larain's address, as it would have been required to do under *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), in response to a proper request by defendant, there is no indication that the defense ever made an explicit request. At oral argument in this court, the government

Jorge was the only witness to testify to defendants' criminal conversations, the prosecution did introduce other evidence, in addition to the tapes, to support its picture of Ariza as a major drug dealer. Another agent testified that ten cashier's checks totalling the sum of $5,000,000 were found concealed in Ariza's left shoe when he was arrested. These were placed in evidence, and the prosecution asked the jury to infer that Ariza intended to use this money to procure drugs such as he had agreed to sell to the undercover operatives. A third DEA agent, Rivera, testified that he had "known of" defendants since November 1977, that he had met Rodriguez in early January 1978 while acting as an undercover agent with Jorge, that he first saw Ariza on January 30 and that he helped arrest defendants on January 31.[4] An officer of the Puerto Rican bank that issued the cashier's checks testified that Ariza came there on November 23, 1977 and opened an account, ostensibly to receive proceeds from dealings in coffee and cattle. The banker testified that deposits in excess of $5,000,000 were made prior to January 30, 1978 with cash brought into the bank in suitcases. On January 30 most of the money was converted into the ten $500,000 cashier's checks found in Ariza's shoe the next day. Two other witnesses testified as to extensive repairs that had been made to the Wendy B that would have increased her cruising range and seaworthiness considerably.

The government also placed in evidence, over objection, certain documents from the files of the Hotel Excelsior in Puerto Rico reflecting that Ariza was a guest there for several nights in November and December 1977 and in January 1978, and that in November 1977 messages for him were left by someone who identified himself as Larain.

Ariza called only one witness: a Puerto Rican lawyer whom he had hired to represent him in tax proceedings initiated by the United States after discovery of the $5,000,000. Based on a visit to Colombia, this witness testified that Ariza owned ranch lands, cattle and other property there valued at many millions. It was the witness's understanding that the foundation of Ariza's wealth was legitimate business activity in cattle, coffee and the like. Given the lawyer's lack of specific information about Ariza's business dealings, however, the jury could have thought that the sources of the $5,000,000 found in Ariza's possession and of his wealth in Colombia were little clarified by this witness.

Against this background, we now consider appellants' objections. They do not deny the legal sufficiency of the evidence to convict, but assert that errors were made, especially in the admission of prejudicial evidence.

## I. Reliability, Past Activities and Statements Attributed to the Non-Witness Informant Larain

Defendants' chief objections on appeal are that the court erred in allowing Jorge, in the course of his testimony, to testify to Larain's purported reputation for reliability. This, together with Jorge's relating of certain information coming from Larain, is said to have been tantamount to making Larain, although absent and hence unavailable for cross-examination, a second government witness to the conspiracy itself.

### A. Larain's reliability and hearsay statements identifying defendants as drug dealers

Before trial, defendants moved to suppress the evidence found on their persons when they were arrested, asserting that there was no probable cause to arrest them. Agent Rivera, who made the decision to arrest, outlined the information that caused him to do so, cited Larain as a major source

represented that it had an understanding with Larain that he would not have to testify at trial, a statement that raises questions as to the government's intentions and capabilities under *Roviaro*. As a new trial must be held in any event, we do not decide whether defendants'

rights under *Roviaro* were in any way implicated.

4. Agent Rivera's testimony is recounted in greater detail *infra*, as defendants argue that certain portions of it were admitted improperly.

of that information, and quite properly testified to Larain's reliability in other investigations in order to demonstrate that the agents had good reason to credit him. The court sustained the arrests and the seizures.

So far, all procedures were correct. Unfortunately, however, after the trial began, the prosecution decided once again to pursue the issue of the informer's reliability, this time in front of the jury. In his opening statement the prosecutor said:

"Now, you will hear during the course of this case that there was an informant. His name is Alberto Larain Mestre. This informant you will hear from the undercover agent, Mr. Fortunato Jorge, who will testify was recruited originally in Spain and he has been working continuously thereafter with the Drug Enforcement Administration for the last seven years. In order that you may gauge the reliability of this informant we will bring evidence to you that this informant had given evidence in other cases, has developed other cases; that the undercover agent who has been working with him had four cases in Europe."

Defendants objected to this statement and to the prosecutor's expressed intention to introduce evidence of the informant's reliability on the ground that it was both prejudicial and irrelevant, a finding of reliability having been made when probable cause to arrest was established; the question of reliability was, they argued, a question for the judge, not the jury. The court overruled the objection, but instructed the jury that the cases on which the agent and the informant had worked previously had no relation to the defendants. The prosecution then continued this line of argument, saying that,

"What we are trying to emphasize is the fact that this informant has given information which is for you to determine in the light of all the facts in the case whether that informant is reliable or is not reliable and, therefore, you can trust what is said about him or not."

Larain's reliability was raised again at the outset of Agent Jorge's testimony:

Jorge testified that he had known Larain since 1964, that Larain became an informer in 1972, and that he established "an official relationship between agent and informer" with him in 1975. Jorge described the role of an informant in DEA investigations and, when asked how many cases he had been involved in with Larain, replied 10 or 12, four of which had resulted in arrests. Jorge stated that 19 defendants had been "developed" through these investigations. Defense counsel again objected. The government responded that it was

"entitled to establish that the information that his man has as a result of prior experience can be trustworthy and, therefore, he acted on the information. . . He had reason to believe that information. That is our position."

The court again overruled the objection and instructed the jury,

"The only reason I am allowing this testimony in as to previous experience of this agent with the informant is to allow you to reach a conclusion as to the reliability of this informant in previous work. I instruct you nothing that may have happened in relation to this informant in previous cases has anything to do with these two defendants. In fact, I can tell you as a matter of fact that these two defendants have not been the object of those previous investigations. It has nothing to do with these defendants."

Jorge then testified that he had worked with Larain in international investigations in the United States, South America and Europe.

The theme of Larain's reliability was raised for the last time in the prosecutor's summation to the jury:

"Now, the most important testimony here was that of Fortunato Jorge. Fortunato Jorge is an agent who for the past 17 years has worked in drug enforcement and for the past seven years in the office of the DEA.

"He told you about the informant, who he is, Mr. Alberto Larain Mestre, how the informant was recruited in Spain, how that informant has worked with Mr. For-

tunato Jorge in cases which have resulted in at least 17 arrests and investigations that carried these two individuals to nine different countries France, Spain, New York—I am sorry, cities, Santo Domingo, Colombia, Aruba, Guadelupe and from the very evidence obtained in this case which are the recordings of the conversations, you can tell the veracity of what the informant was telling Fortunato Jorge.

"You recall that the informant came to Fortunato Jorge on the 30th and told him about the conversation he had with Mr. Ariza. As a result of that meeting he provided that information. He provided Mr. Jorge with two telephone numbers. . . ."

The emphasis upon Larain's reliability was coupled with testimony that Larain gave the DEA agents telephone numbers that led them to Ariza, and that Jorge was entering into drug negotiations that to some degree already had been initiated by the informer in a prior meeting with Ariza.[5] It was thus conveyed to the jury, implicitly but unmistakably, that Larain knew first-hand that Ariza was a drug dealer—and that Larain himself was exceptionally reliable in such matters.[6]

We are obliged to hold that the district court committed reversible error in allowing the prosecution to introduce evidence and make an issue at trial of Larain's past identifications and reliability. Defendants were entitled to have their guilt or innocence determined by the jury on the basis of evidence from witnesses that they had had an opportunity to confront at trial. See U.S.Const. Amend. VI; *Barber v. Page*, 390 U.S. 719, 721, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The reliability of witnesses at trial is often a legitimate issue, of course, but because the jury may not give any credit whatever to the implied testimony, much less the views concerning guilt, of an absent witness, the reliability of non-witnesses is usually wholly irrelevant. Because the absent drug informant's implied beliefs in relation to the charges against Ariza and Rodriguez were not matters for the jury to consider at all, to bolster his reliability as was done here could only serve the illegitimate purpose of directing the jury's attention to these improper items of hearsay, and of giving them enhanced credibility. See Fed.R.Evid. 801, 802; *Moore v. United States*, 429 U.S. 20, 21–22, 97 S.Ct. 29, 50 L.Ed.2d 25 (1976); *United States v. Barash*, 365 F.2d 395, 399 (2d Cir. 1966); *Wright v. Tatham*, 7 Ad. & E. 313, 388–89, 112 Eng. Rep. 488, 516–17 (1837). Bolstering the government's case in this manner served to place the experienced informer alongside Fortunato Jorge as an additional witness, yet one immune from cross-examination by defendants.[7]

The issue involved here is similar to those in *Barash*, 365 F.2d 395; *United States v. Falley*, 489 F.2d 33 (2d Cir. 1973); and *United States v. Check*, 582 F.2d 668 (2d Cir. 1978). In *Barash*, 365 F.2d 395, a government witness testified that the defendant was introduced to him by a Miss

---

5. The government introduced hotel records that a few days before the calls to Ariza, Ariza had been in Puerto Rico and Larain had been trying to contact him at his hotel; the calls themselves, as well as Jorge's testimony, suggest that Larain and Ariza had already discussed a drug deal—when Jorge contacted Ariza the first time, he "let him know that we were interested in continuing with the deal."

6. The same suggestion was made by Agent Rivera, who also indicated that he had heard of defendants from Larain.

7. Evidence of Larain's reliability could be considered in the pretrial suppression hearing to determine whether probable cause to arrest ex-

isted because arresting officers and courts may rely on hearsay in order to determine probable cause. *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Jones v. United States*, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Hearsay may not, however, be considered in determining the guilt or innocence of defendants, *e. g., Moore v. United States*, 429 U.S. 20, 21, 97 S.Ct. 29, 50 L.Ed.2d 25 (1976) (court may not rely on out-of-court declaration of informant). The government, which in most respects presented its case ably, should have been aware of this basic distinction.

Lupescu, who had "never introduced [him] to anyone except someone who was going to pay [him] off." 365 F.2d at 399. The court held that this was inadmissible hearsay because Miss Lupescu's conduct "conveyed her meaning without the use of words." *Id.* This and other errors required reversal. *Falley,* 489 F.2d 33, a drug importation case, also involved an effort by the government to establish the credibility of an informant, albeit one who did take the stand. The government introduced in evidence narcotics that the informant had brought into the country, not for the defendants but for a third party. The Second Circuit held that this evidence should have been excluded because it had no relation to the defendants and was highly prejudicial. 489 F.2d at 37. In *Check,* 582 F.2d 668, a government informant allegedly had been involved in meetings with the defendant but refused to testify. Spinelli, an undercover agent, became the chief government witness and, in response to careful questions on direct, so related his conversations with the informant as to convey, in effect, what the informant had said to him about his meetings with Check. The court observed that, "for much of his testimony Spinelli was serving as a transparent conduit for the introduction of inadmissible hearsay information obviously supplied by and emanating from the informant . . . ." 582 F.2d at 678.

■ The evidence of Larain's past ability to identify drug dealers, coupled with evidence making it plain that he had so identified defendants, was tantamount to a hearsay statement by Larain incriminating defendants, just as the hearsay statements condemned in *Check, Barash* and *Falley* incriminated the defendants in those cases.

The question remaining is whether this error was so prejudicial as to require reversal and a new trial. To affirm, we would have to find that the error did not influence the jury or that it had but slight effect, *see Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[8] This we regret we cannot say, notwithstanding the substantial evidence of guilt. It is true that Jorge's credibility was the central issue. If his accounts of his meetings with defendants were believed, Larain's hearsay views concerning defendants' guilt were merely cumulative. If, moreover, the jury disbelieved Jorge, it would scarcely have convicted merely because the informer was supposedly reliable, and thought defendants guilty. But one cannot confidently separate Jorge's credibility from the impression made by placing Larain's reputation for reliability, and his implied testimony against defendants, on the same side of the scale. The latter reinforced the former. The importance the prosecution placed on bringing Larain into the picture is reflected by the prosecutor's references to the informer's reliability in both his opening and closing arguments, and by his successful efforts to acquaint the jury with Larain's participation in the investigation and his knowledge of defendants' illicit activities. We cannot say that

---

**8.** In addition to the evidence of Larain's past identifications of drug dealers and reliability and of his identification of defendants, other hearsay statements inculpating defendants and attributed to Larain were admitted as evidence. Jorge testified that he called Ariza and identified himself as a friend of Larain, and that "he had offered a business of marijuana and cocaine." As the telephone conversation made no explicit reference to drugs, this interpretation was justified only if Jorge had prior knowledge that Ariza was a dealer and would so understand the call—knowledge only Larain could have supplied. Defendants now object to this as an inadmissible hearsay statement of Larain's, but they failed to so object at trial. Later defendants did object when Jorge testified that, after a telephone conversation on

December 4 with one of Ariza's henchmen, he and Larain went to Miami to continue the negotiations "about the drugs." Again, since drugs had not yet been discussed explicitly by Ariza, the fact that they were the subject of negotiation arguably was the hearsay statement of Larain—although by that time Jorge undoubtedly had his own perception of the conversations and could have been speaking for himself. In any event, defendants' objection came too late. Defendants' failure to object when this information came in initially left the jury free to consider it and subsequent hearsay of similar import. *See* Fed.R.Evid. 103(a)(1); *Diaz v. United States,* 223 U.S. 442, 450, 32 S.Ct. 250, 56 L.Ed. 500 (1912); 5 J. Wigmore, Evidence § 1361, at 2 n.1 (Chadbourn rev. 1974).

matters so strenuously and deliberately emphasized by the prosecution were harmless.

### B. *Larain's messages for Ariza at the Hotel Excelsior*

The government established that Ariza had been in Puerto Rico in November 1977 and had opened a bank account into which about $5 million was deposited eventually.[9] These facts were introduced through the testimony of a bank officer and by introducing records of the Hotel Excelsior, where Ariza stayed. In addition to the hotel bill, which fell within the business records exception to the hearsay rule, Fed. R.Evid. 803(6), the government introduced, over objection, four telephone messages and a note, all allegedly from Larain. None of these were ever received by Ariza.

■ The district court admitted the messages with an instruction that they were being introduced not "to prove the truth of the matter contained therein, [but] just the fact that they were there . . . ." Despite the court's limiting instruction, the likely function of this evidence was to show that Larain had tried to contact Ariza.[10] Because, practically speaking, they were irrelevant to prove anything but the truth of the matter asserted, they should have been excluded. *See* Fed.R.Evid. 801, 802. Their chief use was, in any event, the forbidden one, see "A" above, of enhancing Larain's role in the investigation, thus shoring up his ability, in absentia, to verify that Ariza was a drug dealer.

### C. *Larain's statements on the tapes*

■ Defendants object that the tapes of the conversations between Ariza and Larain should not have been admitted in their entirety; they argue that, while Ariza's statements were properly introduced as admissions of a party opponent, Fed.R.Evid. 801(d)(2), Larain's statements were not. Even overlooking defendants' failure to object at trial, this argument is frivolous: the tapes were properly authenticated and, because the conversations were short and consisted primarily of questions and answers, Larain's statements were essential to give content to Ariza's. *See* 7 J. Wigmore, Evidence § 2094-95 (Chadbourn rev.1978). There is no general rule that the voices of parties to a taped telephone conversation who do not appear at trial must be suppressed. *Cf. United States v. Gladney*, 563 F.2d 491, 493 (1st Cir. 1977) (informer's unavailability at trial does not prevent showing of consent to taping of conversations).

## II. *Evidence of Cash Transactions*

■ Ariza argues that the evidence that large amounts of cash were deposited in his bank account in Puerto Rico and that a bank time deposit slip for $1,203,691 was found in his left shoe when he was arrested was irrelevant and inadmissible. Rodriguez similarly objects to the evidence that $5 million in cashier's checks was found on Ariza. They stress that there was no allegation that Ariza had received the money illegally and no evidence that the money was linked to the crime charged.

We think that the evidence in question did bear on defendants' guilt and was admissible. The crime charged was a conspiracy to make a large-scale, multimillion dollar drug transaction, and the source of Ariza's funds, which had not been declared as money either brought into or earned in Puerto Rico, was highly suspect. The money involved was a large amount by any standard, and was brought into the bank in

---

**9.** Ariza did not declare any significant amount of currency on his arrival in Puerto Rico.

**10.** Even accepting the court's rationale for admitting the statements, we think that they should have been excluded. They were irrelevant and unnecessary to show that Ariza had stayed at the Excelsior—Ariza never received them and, in any event, the fact that he was present was already established by the more reliable hotel bill. Thus the relevance of the messages, as showing that someone thought that Ariza was at the Excelsior, was outweighed by their prejudicial effect in linking Larain and Ariza and thus further bolstering the absent witness' credibility. *See* Fed.R.Evid. 403. We do not consider the different question of admissibility that would be presented had Larain testified at trial and authenticated the messages.

Puerto Rico in five, ten and twenty dollar bills packed in suitcases—in one instance it had taken until eleven o'clock at night to count it out. A jury might reasonably believe that one engaged in a legitimate commodities business would not operate in this way. From the modus operandi involving cash in such amounts, the jury could logically infer that defendants were in fact engaged in illicit activities of the sort indicated in the other evidence. This evidence was relevant and was properly admitted. *United States v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975) (evidence of "possession of large amounts of unexplained cash in connection with evidence of narcotics trafficking on a large scale"); *see United States v. Viserto*, 596 F.2d 531 (2d Cir. 1979); *Falley*, 489 F.2d at 38; *United States v. Hinton*, 543 F.2d 1002, 1012–13 (2d Cir.), *cert. denied*, 429 U.S. 980, 1051, 1066, 97 S.Ct. 493, 764, 796, 50 L.Ed.2d 589, 767, 783, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1976).[11]

### III. *Agent Rivera's Testimony*

Agent Rivera was the DEA agent who made the decision to arrest the defendants on January 31, 1978 at the airport. After he described the arrests on direct examination, he was cross-examined sharply. Defense counsels' goal seemed to be to establish that, as defendants' activities at the airport were, to all appearances, innocent, their arrests were groundless. Counsel belabored that the agents had no warrant and

that one easily could have been secured. Coming, as it did, after the suppression proceeding at which the validity of the arrests was thoroughly explored and the court, with good reason, had ruled in favor of the government, this cross-examination was entirely misdirected, and indeed is cited by Ariza's appeal counsel as evidencing the incompetency of Ariza's trial attorney.

It is perhaps not surprising that as soon as this ill-conceived exercise ended, the prosecution leapt to its feet to establish that Rivera, indeed, had had good reason to order the arrests. The following transpired:

"Q. You said to questions of [defense counsel] that you decided to put them under arrest because you knew of the crime that they had committed. What was that crime, in your opinion, that made the—

[Defense counsel]: We object to the question because that is for the jury to decide.

.  .  .  .  .

The Court: The objection is overruled. What was the crime that they had committed, if you know?

[Rivera]: They had conspired—

.  .  .  .  .

[Rivera]: They has conspired and agreed among them and with other people to deliver a load of 25 kilograms of cocaine and 50,000 pounds of marijuana[12] to the United States of America .  .  .  ."

---

11. *Williams v. United States*, 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509 (1897), cited by defendants for the proposition that the evidence of the cash deposits was inadmissible is not on point. There the defendant was accused of taking two bribes of $85 and $100 from Chinese immigrants—a financial event of such small scale as not to suggest any connection with the bank deposits of the defendant and his wife of less than $5,000. We share the view expressed in *United States v. Jackskion*, 102 F.2d 683, 684 (2d Cir.), *cert. denied*, 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517 (1939), a bootlegging case, that,

"[W]here a defendant is on trial for a crime in which pecuniary gain is the usual motive, evidence of the sudden acquisition of money

by the defendant is admissible, even though the source of the money is not traced. .  .  . [S]uch evidence may, when taken with proof of other facts, have a logical tendency to prove criminal misconduct. The weight will of course vary, depending among other things on whether the money was kept secretively by the accused. .  .  . [T]he Williams case .  .  . is to be taken, we think, as no more than a ruling on the particular facts there presented."

12. The prosecution then asked Rivera where he had obtained this information, to which he replied:

"I obtained that information by listening to the tapes, by having conversation with—by being present, undercover conversation be-

██ Appellants now contend that the court committed reversible error in permitting Rivera to testify as he did.

We disagree, although we think that the court should *sua sponte* have instructed the jury that Rivera's views concerning defendants' guilt were to be considered solely for the purpose of determining whether he had a reasonable basis to make the arrests, and not as evidence of their guilt in this trial. The government did not have to sit supinely by while defense counsel tried to make the jury believe that the arrests were examples of police brutality or error. As it was the defense who unwisely chose to raise the question of probable cause for the arrests, the prosecution could respond to the extent necessary to demonstrate that Rivera had, in fact, a proper basis for the arrests. To this end, Rivera was entitled to testify to the nature of the crime or crimes he believed defendants had committed when making the arrests as well as to the sources of his information.

Testimony of this sort, of course, would not have been admissible, had the defense not first rashly insisted upon raising the issue of probable cause in the presence of the jury. Rivera's opinion as to whether or not defendants were guilty was in no event admissible to prove their guilt,[13] and the narrow question of probable cause to arrest, on which Rivera's earlier views concerning their guilt and the information available to him were relevant, was a legal issue that normally should have been left to the suppression hearing held outside the jury's presence. But once the defense injected the probable cause issue directly into the trial itself, the prosecution was entitled to respond by giving its witness an opportuni-

ty to demonstrate that he had probable cause to arrest. The court should then have taken pains to tell the jury that the witness' testimony concerning his information and belief as to defendants' guilt was admitted solely because relevant to whether or not Agent Rivera had reasonable cause to make the arrests. The jury should have been forbidden to consider Rivera's testimony concerning his beliefs and information about defendants' guilt as actual evidence of guilt.

If the court's failure in this situation to give a limiting instruction *sua sponte* were the sole error in a case, we would be unlikely to find plain error and reverse, although this of course would depend on all the facts and circumstances. The defense, having played with fire, is in a poor position to scream when burned. Since a new trial is required in any event, we do not pursue the matter further.

### IV. *Evidence of Pending Tax Case*

In defense Ariza called a Puerto Rico tax lawyer who testified that he had been retained to represent Ariza in a civil tax deficiency case brought against him by the United States in relation to the $5 million found in his possession on his arrest. In an effort to suggest that the $5 million was from legitimate sources, the lawyer testified that Ariza was a wealthy man with substantial property in Colombia. He did not testify, however, to any direct link between Ariza's Colombian property and the $5 million.

██ The government, which originally objected to the lawyer's testimony as irrelevant, brought out on cross-examination that

---

tween Mr. Rodriguez and Special Agent Jorge, by listening to conversations, by talking to Alberto Larain and by reading some reports."
Although this revealed that Rivera's information was to some extent based on hearsay, hearsay is a permissible basis for a determination of probable cause, *see* note 7, *supra*, and the testimony was relevant for the limited purpose of showing that, contrary to defendants' assertions, Rivera did have an adequate basis for arresting them.

13. *Huff v. United States*, 273 F.2d 56, 61 (5th Cir. 1959); *Simmons v. United States*, 92 U.S. App.D.C. 122, 124–25, 206 F.2d 427, 429–30 (D.C.Cir.1953); *Iva Ikuko Toguri D'Aquino v. United States*, 192 F.2d 338, 371 (9th Cir. 1951), *cert. denied*, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343 (1952); *Wesson v. United States*, 164 F.2d 50, 54–55 (8th Cir. 1947); *Deaver v. United States*, 81 U.S.App.D.C. 148, 152–153, 155 F.2d 740, 743 (D.C.Cir.), *cert. denied*, 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659 (1946).

the tax deficiency cases would not have been asserted against Ariza's property in Colombia, but rather against the $5 million deposited in one month in a bank in Puerto Rico, where Ariza had no known property. Defendants now object that the prosecution's treatment of the tax claim on cross-examination implied that Ariza had earned money illegally in Puerto Rico. Since the tax deficiency case was as yet unproven, defendants argue that this implication was "irrational and therefore constitutionally invalid," citing *Barnes v. United States*, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973) (permissible inference that one in unexplained possession of stolen goods knew property was stolen held reasonable), and *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) (inference that, absent satisfactory explanation, possessor of marijuana knew marijuana was illegally imported held irrational). This argument mischaracterizes the import of the cross-examination and is without merit. The prosecution did not argue that as a matter of law Ariza could be presumed to have earned money illegally. The defense itself had acquainted the jury with the pending tax case; it had invited inquiry into the source of the $5 million and had tried to suggest that it originated in Colombia. It was well within the permissible limits of cross-examination and impeachment to explore the possible scope of the tax claims. It was also perfectly legitimate to try to show that Ariza's vast holdings in Colombia bore little necessary relation to the $5 million that he had in Puerto Rico, and to use information developed on direct examination to "hoist defendants with their own petard." In addition to the fact that the tax case focused on Ariza's funds in Puerto Rico and not in Colombia, the prosecutor brought out that the lawyer had seen no documents linking Ariza's money in Puerto Rico to sales of coffee, cattle or grain, and that Ariza had declared no money on entering Puerto Rico, despite a requirement that amounts in excess of $5,000 be noted. This served the legitimate impeaching function of casting doubt on the lawyer's knowledge of the true source of Ariza's wealth and on the value of his testimony on that subject. Indeed, by discrediting the witness' assurances that Ariza's wealth was derived from legitimate business sources, it enhanced the tendency of the evidence of Ariza's cash transactions to confirm the charge that Ariza was a large-scale drug dealer. *See Hinton*, 543 F.2d at 1012–13 (failure to file tax return); *cf. Falley*, 489 F.2d at 38–40 (tax returns showing low income). While Ariza understandably was chagrined at having a subject he had raised turned against him, the government did no more than employ cross-examination for a permissible purpose.

## V.  The Court's Charge

Defendants object to two statements by the district court in its instructions to the jury. The first came in connection with its charge on the intent required to establish a conspiracy:

> "[W]ith respect to an offense such as charged in this case, specific intent must be proved beyond reasonable doubt before there can be a conviction.

> .    .    .    .    .

> "To establish the intent essential to a conviction for conspiracy the evidence of knowledge must be clear and not equivocal. A suspicion, however strong, is not proof and will not serve in lieu of proof. Charges of conspiracy are not to be made out by piling inference upon inference.

> "Intent ordinarily may not be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made or done or omitted by the defendant, and all other facts and circumstances, in evidence which indicate their state of mind. *It is ordinarily reasonable to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.*"

Although no objection was made at trial, appellants now object to the italicized sen-

**1228**

tence in this portion of the charge on the ground that it undermined the requirement that the government show specific intent to commit the crime charged.

■ Charges that a jury "should presume that a person intends the natural and probable consequences of his acts" have been disapproved for the reason asserted by defendants, *e. g., United States v. Bertolotti*, 529 F.2d 149, 159 (2d Cir. 1975); the Supreme Court recently held unconstitutional an instruction that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts" because it suggested a mandatory inference of intent and thus may have shifted the burden of proof on the issue of intent to the defendant, *Sandstrom v. Montana*, —— U.S. ——, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). In light of these cases, courts obviously should steer clear of this venerable formulation—today it is a clear invitation to appellate trouble.

While observing that the court came perilously close to committing error here, we refrain from ruling on the propriety of the instruction when doing so is unnecessary for the disposition of this case. We merely caution the court to avoid this language in future instructions.

■ Defendants' remaining objection is that the court gave the jury several standards of proof, stating that conviction required proof beyond a reasonable doubt, that the jurors should be "convinced to a moral certainty," and that proof of knowledge should be "clear and unequivocal." Reading the charge as a whole, we think that it conveyed to the jury the proper "beyond a reasonable doubt" standard of proof; nevertheless, we have cautioned previously against use of language suggesting that this standard means proof to a moral certainty, *e. g., Dunn v. Perrin*, 570 F.2d 21, 24 (1st Cir.), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978), and do not encourage its use on retrial.

*The judgment of conviction is reversed and the case remanded for a new trial.*