**UNITED STATES of America, Appellee,**

v.

**Daniel Isaac DRAKE,
Defendant-Appellant.**

**No. 81–1336.**

United States Court of Appeals,
First Circuit.

Argued Jan. 5, 1982.

Decided March 19, 1982.

Owen S. Walker, Federal Public Defender, Boston, Mass., for defendant-appellant.

John H. La Chance, Asst. U. S. Atty., Boston, Mass., with whom William F. Weld, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, BOWNES and TIMBERS,* Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant, Daniel Isaac Drake, appeals his conviction after a jury trial for manufacturing methamphetamine, a controlled substance, in violation of 21 U.S.C. § 841(a)(1). The evidence leading to his conviction was obtained pursuant to a federal search warrant which was held valid after a pretrial hearing on defendant's motion to suppress. There are two issues on appeal, the validity of the warrant and the trial judge's charge to the jury on reasonable doubt.

I. *The Warrant*

Appellant's argument that the warrant authorizing a search of his laboratory was unsupported by probable cause has two parts. He claims that there was no probable cause to believe that methamphetamine

* Of the Second Circuit, sitting by designation.

was being manufactured on the premises and, if it was, that there was no probable cause to believe that any such manufacture was illegal. The warrant application contained two affidavits of Special Agent Crowe of the Drug Enforcement Administration (DEA). Since the second affidavit repeats the facts of the first one for the purpose of justifying a night-time search, we focus on the first affidavit[1] which is included as an appendix.

Based on the personal observations of Agent Crowe and another DEA agent and the opinions of a DEA forensic chemist, the affidavit contains the following recitations. Appellant is identified as president of the Wyvern Co., Inc., a company incorporated in Massachusetts in 1975. S.G.A. Scientific, Inc., of Bloomfield, New Jersey, received an order through its Boston office on January 31, 1978, for two kilograms of phenyl 2-propanone (P2P), six kilograms of methylamine, $2800-worth of additional chemicals, laboratory equipment and cutting materials "which can be used in the clandestine manufacture of methamphetamine." The purchase order had been placed by W.C.I. Laboratories-The Wyvern Co., located at 639 Massachusetts Ave., Room 301, Cambridge, Massachusetts. On March 8, 1978, and April 12, 1978, Agent Crowe observed appellant accept delivery of the S.G.A. order in two installments at the building at 639 Massachusetts Ave. Also, on April 12, appellant was seen opening the boxes that had just arrived and washing glassware inside his office. In the middle of the afternoon on the same day, he was seen leaving the lab and driving around Cambridge in a suspicious manner: circling the same block three times, watching in the rear view mirror, making an abrupt U-turn, and moving at five miles per hour. Although periodic surveillance was continued for the next week, no activity at all was observed at the Wyvern Co. laboratory.

On April 28 Agent Crowe saw appellant enter the building at 639 Massachusetts

Ave. at midnight and remain there throughout the night. The next morning another DEA agent took photographs of the interior of the lab, where glassware, tubing and chemicals were assembled on the workbench. The same day Agent Crowe related the above facts to DEA chemist Fasanello who was experienced in the investigation of clandestine laboratories. In the chemist's opinion all of the requisite chemicals for the synthesis of methamphetamine had been purchased by appellant, including lactose and dextrose, common cutting materials or dilutants. Two days later, on Sunday, April 30, appellant was observed by Agent Crowe to enter the laboratory at 6 A.M. where he remained until 8 P.M. At that time Agent Crowe observed a tri-necked flask with stoppers in all three necks and assorted other lab equipment inside the laboratory. He related these facts to the DEA chemist who said that, in his opinion, appellant had only one more step to take in the manufacturing process to convert the amphetamine free base into crystal form. The following day the chemist informed Agent Crowe that, in his opinion, the chemicals P2P and methylamine in combination could only be used to manufacture methamphetamine. On the basis of this information the magistrate issued a search warrant for the Wyvern Co. laboratory.

■ Our inquiry into whether or not the affidavit is sufficient for a finding of probable cause to issue a search warrant is guided by certain well-settled principles. The standard for probable cause is only the probability of criminal activity, not a prima facie showing of such. *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *United States v. Ellsworth*, 647 F.2d 957, 964 (9th Cir. 1981); *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir.), cert. denied, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979). The evidence need only be sufficient to persuade a person of reasonable caution to believe that a crime is being or has been committed.

1. The second affidavit also states that Agent Crowe had at that time been employed by the DEA for eight years.

*Rosencranz v. United States*, 356 F.2d 310, 314 (1st Cir. 1966). *See Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). Although the evidence sufficient for probable cause must be more than what amounts to a mere suspicion, it is considerably less than what is required for a conviction of guilt. *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965); *United States v. Howe*, 591 F.2d 454, 457 (8th Cir.), *cert. denied*, 441 U.S. 963, 99 S.Ct. 2411, 60 L.Ed.2d 1069 (1979); *United States v. Welebir*, 498 F.2d 346, 349 (4th Cir. 1974). The issuing magistrate is entitled to draw reasonable inferences from the facts in the affidavit, *United States v. Jackstadt*, 617 F.2d 12, 14 (2d Cir.), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980), 449 U.S. 1084, 101 S.Ct. 870, 66 L.Ed.2d 808 (1981); *Rosencranz v. United States, supra*, and once he has done so and found probable cause, "the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca*, 380 U.S. at 109, 85 S.Ct. at 746.

■ We believe that, from the facts and circumstances appearing in the affidavit and the reasonable inferences therefrom, the magistrate reasonably concluded that the crime of illicit manufacture of a controlled substance was probably being committed at the Wyvern Co. lab. The first fact contributing to such a conclusion was the order placed to S.G.A. Scientific, Inc., for numerous chemicals known to be ingredients of methamphetamine, including two, P2P and methylamine, which in combination can only produce methamphetamine. A strong inference that they are being combined arises from the fact that they were obtained at the same time. *United States v. Anton*, 633 F.2d 1252, 1254 (7th Cir. 1980), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 870, 66 L.Ed.2d 808 (1981). "When the possible combinations of these chemicals includes an end product which is an illegal substance, it is reasonable to infer that manufacture of such a substance is taking place." *Id.* at 1254.

The purchase in a single order of all the requisite chemicals, known as precursors, for the manufacture of a controlled drug is a "red flag" fact which arouses suspicion, although not necessarily establishing probable cause. *United States v. Noreikis*, 481 F.2d 1177, 1178 (7th Cir. 1973), *cert. denied in part and judgment vacated in part on other grounds*, 415 U.S. 904, 94 S.Ct. 1398, 39 L.Ed.2d 461 (1974); *United States v. Failla*, 343 F.Supp. 831, 835 (W.D.N.Y.1972). But it justified the subsequent surveillance of the premises. When, after unpacking the second and final shipment of chemicals, the appellant left the lab and drove in what appeared to be an evasive manner, a reasonable inference could be drawn that he feared he was being followed. His subsequent cessation of laboratory activity implies that his fear had been confirmed. Appellant's late-night and Sunday entries into the building, combined with the assembly of laboratory equipment indicating chemical synthesis in progress, complete the picture of a clandestine drug-manufacturing operation.

Appellant singles out some of these observed events and asserts possible innocent explanations for them. We do not deny that individual facts averred in the affidavit may be capable of noncriminal explanation. But, as stated in *United States v. Patterson*, 492 F.2d 995 (9th Cir.), *cert. denied*, 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974), where the court found probable cause to support a warrantless search, "[t]he succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one." *Id.* at 997. *See United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir.), *cert. denied*, 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975). In *Patterson* the "prudent man" whose conclusion regarding probable cause was upheld was "an experienced border agent familiar with the methods employed by smugglers." *Id.* at 997. In our case the observations and opinions of experienced DEA personnel familiar with the methods of operators of clandestine laboratories were evalu-

ated by a neutral magistrate, whose probable cause determination is itself a substantial factor in our review and entitled to great deference by us. *Spinelli v. United States,* 393 U.S. at 419, 89 S.Ct. at 590; *United States v. Jackstadt,* 617 F.2d at 13; *United States v. Fried,* 576 F.2d 787, 791 (9th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978); *Rosencranz v. United States,* 356 F.2d at 314.

Our rejection of appellant's attempt to paint each individual fact as equally compatible with innocent behavior is rooted in the probable cause standard itself. The warrant application did not purport to provide evidence establishing a crime beyond a reasonable doubt, nor was the magistrate being asked to determine the guilt or innocence of any person. The issue is whether the affidavit conveyed sufficient facts to enable the magistrate reasonably to infer a likelihood that methamphetamine was being manufactured illicitly on the premises to be searched, and we believe that it did; this is all that the fourth amendment requires. *See United States v. Welebir,* 498 F.2d at 349. At most, appellant's argument makes this a marginal case for the existence of probable cause, which calls for re-

solving any doubts in favor of the warrant. *United States v. Ventresca,* 380 U.S. at 109, 85 S.Ct. at 746; *United States v. Shursen,* 649 F.2d 1250, 1255 (8th Cir. 1981); *United States v. Jackstadt,* 617 F.2d at 14; *Rosencranz v. United States,* 356 F.2d at 314.[2]

Appellant next claims that, even if there was probable cause to believe that methamphetamine was being manufactured at the Wyvern laboratory, the affidavit does not support probable cause to believe that such manufacture was illegal. Specifically, his argument is that the affidavit's failure to state that the lab was not licensed to manufacture the drug is fatal. This particular ground was not raised in appellant's motion to suppress in the district court. Issues not addressed to the district court will not be considered by this court in the first instance except in extraordinary circumstances not present here. *Needleman v. Bohlen,* 602 F.2d 1, 4 (1st Cir. 1979); *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir. 1979). Since this ground was not pursued in his motion to suppress below, appellant may not raise it on appeal. *United States v. One Clipper Bow Ketch NISKU,* 548 F.2d 8, 10 n.3 (1st Cir. 1977).[3]

---

**2.** Appellant cites several so-called "clandestine laboratory" cases in which the search warrants were held to be supported by probable cause. He seeks to distinguish each one from the case at bar by pointing to facts averred in the affidavits in those cases that are absent here. A careful study of the cases reveals that each one turns on its own facts, that the combinations of facts in each case are varied, and that no one fact is determinative in a finding of probable cause. *See United States v. Coppage,* 635 F.2d 683 (8th Cir. 1980); *United States v. Anton,* 633 F.2d 1252 (7th Cir. 1980), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 870, 66 L.Ed.2d 808 (1981); *United States v. Jackstadt,* 617 F.2d 12 (2d Cir.), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980), 449 U.S. 1084, 101 S.Ct. 870, 66 L.Ed.2d 808 (1981); *United States v. Park,* 531 F.2d 754 (5th Cir. 1976); *United States v. Gordon,* 580 F.2d 827 (5th Cir.), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *Cowen v. U.S.,* 439 U.S. 1079, 99 S.Ct. 860, 59 L.Ed.2d 49 (1978); *United States v. Martin,* 509 F.2d 1211 (9th Cir.), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975); *United States v. Smith,* 499 F.2d 251 (7th Cir. 1974); *United States v. Welebir,* 498 F.2d 346 (4th Cir. 1974); *United States v. Moore,* 452 F.2d 569 (6th Cir. 1971), *cert. de-*

nied, 407 U.S. 910, 92 S.Ct. 2435, 32 L.Ed.2d 684 (1972).

**3.** We do note, however, that were we to reach this issue on the merits we would still uphold the validity of the warrant. The omission in an affidavit of an averment as to the lack of a license will not invalidate a search warrant where the facts set forth in the affidavit otherwise support an inference of the reasonable probability of criminal activity. *United States v. Howe,* 591 F.2d 454, 457–458 (8th Cir.), *cert. denied,* 441 U.S. 963, 99 S.Ct. 2411, 60 L.Ed.2d 1069 (1979). *Cf. Commonwealth v. Marra,* —— Mass.App.Ct. ——, 426 N.E.2d 1180 (1981) (search warrant invalid where, besides no averment of lack of license to store dynamite, no information in affidavit to indicate storage was under such circumstances as might show probability that it was unlicensed). Using a commonsense rather than hypertechnical approach, as required under *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), we think a strong inference can be drawn from the information in the affidavit that the manufacture of methamphetamine at Wyvern was probably illegal. Appellant's evasive driving and subsequent suspension of ac-

## II. *The Charge*

In the second line of attack on his conviction appellant argues that the trial court's charge to the jury on reasonable doubt constituted reversible error. He challenges the following instructions:

> Proof beyond a reasonable doubt must, therefore, be proof of such convincing character that you would be willing to rely and act upon it in the most important of your own affairs.
>
> A reasonable doubt exists whenever, after careful and impartial consideration of the evidence in the case, a juror does not feel convinced to a moral certainty that the defendant is guilty of the charge.

Although an objection was made to the instruction containing the words "willing to rely and act", none was made to the "moral certainty" language.

We have previously expressed our disapproval of the "willing to act" formulation while holding that its use does not constitute plain error in the absence of an objection. *United States v. Gordon*, 634 F.2d 639 (1st Cir. 1980).[4] Ever since the Supreme Court indicated its displeasure with this language in *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 139, 99 L.Ed. 150 (1954), there has been consistent criticism of the "willing to act" instruction; the courts have indicated a preference for the phrase "hesitate to act." *See United States v. Gordon, supra; United States v. Robinson*, 546 F.2d 309, 313–14 (9th Cir. 1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 596 (1977); *United States v. Leaphart*, 513 F.2d 747, 750 (10th Cir. 1975); *United States v. Richardson*, 504 F.2d 357, 361 (5th Cir. 1974), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1406, 43 L.Ed.2d 659 (1975); *United States v. Emalfarb*, 484 F.2d 787, 790–91 (6th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973).[5] In none of these cases, however, did the court reverse the conviction because, notwithstanding the improper "willing to act" portion, the charge as a whole was found to adequately convey the meaning of reasonable doubt. *See Holland v. United States*, 348 U.S. at 140, 75 S.Ct. at 139.

■ We have also noted that there has been criticism of comparing the reasonable doubt standard with the process employed by a juror in making important decisions in his or her own life. *See Dunn v. Perrin*, 570 F.2d 21, 24 (1st Cir.), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978); *Scurry v. United States*, 347 F.2d 468, 470 (D.C. Cir. 1965), *cert. denied*, 389 U.S. 883, 88 S.Ct. 139, 19 L.Ed.2d 179 (1967). Although we are mindful of the potential this portion of the instruction has for impermissibly reducing the government's burden of proof, *Dunn v. Perrin, supra*, this language must also be read in the context of the charge as a whole. 570 F.2d at 25. *See Scurry v. United States, supra*.

■ In light of the trial court's repeated references to the presumption of innocence and the government's constant burden of proof, and its instruction directly preceding the "willing to act" portion explaining reasonable doubt correctly as "the kind of doubt that would make a reasonable person hesitate to act," we cannot say that there was reversible error in this portion of the charge.

---

tivity at the laboratory, both occurring immediately after completed delivery of the chemicals, and his unusual working hours add up to the reasonable probability of illegal activity.

4. That case was decided, however, after the charge in the case at bar was given.

5. Some courts appear to have misunderstood the Supreme Court's concern in *Holland*. There the charge under attack was one which defined reasonable doubt as " 'the kind of doubt ... which you folks in the more serious and important affairs of your own lives might be willing to act upon.' " *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 139, 99 L.Ed. 150 (1954) (emphasis added). This instruction is manifestly wrong as it turns the reasonable doubt standard on its head. Since *Holland*, the charge under scrutiny by the courts has uniformly defined *proof* beyond a reasonable doubt as that on which a person might be willing to act. Although still dubious, this at least makes sense, compared with acting-in-reliance-on-a-doubt as criticized in *Holland*.

As for the "moral certainty" language, our disapproval of it as a definition of proof beyond a reasonable doubt is by now well-settled. *United States v. DeVincent*, 632 F.2d 147 (1st Cir. 1980); *United States v. Indorato*, 628 F.2d 711 (1st Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980); *United States v. Ariza-Ibarra*, 605 F.2d 1216 (1st Cir. 1979). Our concern is that the jury might feel justified in convicting based on a feeling rather than on the facts in the case. *United States v. Indorato*, 628 F.2d at 721 n.8.[6]

Although in *DeVincent, Indorato* and *Ariza-Ibarra* we cautioned trial judges against the use of "moral certainty," these cases were decided after the instruction in this case was given. Moreover, there was no objection made below to this portion of the charge. Standing alone, this language does not constitute plain error, *see United States v. Indorato*, 628 F.2d at 721, and we are satisfied that, when taken as a whole, the charge adequately apprised the jury of the reasonable doubt standard.

The charge at issue here is not like the one we condemned in *Dunn v. Perrin* where reasonable doubt was improperly explained to the jury three times. 570 F.2d at 25. The trial judge here instructed, "When we talk about a reasonable doubt, we mean a doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act." Furthermore, after the "moral certainty" phraseology, he advised the jury, "A defendant is never to be convicted upon mere suspicion or conjecture. If the evidence in the case permits two conclusions, one of guilt and one of innocence, then the jury should, of course, come to the conclusion of innocence[.]" Under the circumstances, we believe that the reasonable doubt charge as a whole was not infirm. We emphasize, however, in light of *DeVincent, Indorato,* and *Ariza-Ibarra*, that in the future district

courts should eschew "moral certainty" phraseology.

*Affirmed.*

## APPENDIX

### AFFIDAVIT

I, Joseph Crowe, Jr., Special Agent, Drug Enforcement Administration, hereby depose and state that:

1. On May 13, 1975 the Wyvern Co. was incorporated in the district of Massachusetts pursuant to Massachusetts law.

2. Daniel Isaac Drake, 1170 Massachusetts Avenue, Cambridge, Massachusetts was listed as President of the Wyvern Co.

3. On January 31, 1978 S. G. A. Scientific Inc., 735 Broad Street, Bloomfield, New Jersey, 07003 received an order for two kilograms of Phenyl 2-propanone (P2P), six kilograms of methylamine and $2,800 worth of additional chemicals, laboratory equipment, and cutting materials which can be used in the clandestine manufacture of methamphetamine. The order was placed through S. G. A.'s Boston, Massachusetts office by W.C.I. Laboratories—The Wyvern Co., 639 Massachusetts Avenue, Room 301, Cambridge, Massachusetts. An additional address for the Wyvern Co. was given which is 1170 Massachusetts Avenue, Cambridge, Massachusetts and a certified check for $2,800 accompanied the order. The order was processed under S. G. A. Invoice No. 4902.

4. On March 8, 1978 Special Agent Albert J. Duffy, Detective Kenneth Gilliam of the Cambridge, Massachusetts Police Department and myself observed Daniel Isaac Drake, President of The Wyvern Co., Inc., accept the partial shipment of Invoice No. 4902, to include two kilograms of Phenyl 2-propanone (P2P), other assorted chemicals, and laboratory equipment at the rear entrance of 639 Massachusetts Avenue, Cambridge, Massachusetts.

---

**6.** We note that the charge in this case is less objectionable than the one in prior cases. It is couched in the negative as a definition of reasonable doubt rather than as an affirmative definition of proof beyond a reasonable doubt and it makes clear that the jury must base its decision on the evidence in the case.

5. On April 12, 1978, I observed Daniel Isaac Drake accept the six kilograms of methylamine as well as other assorted chemicals and laboratory equipment listed on Invoice No. 4902, at the front entrance of 639 Massachusetts Avenue, Cambridge, Massachusetts.

6. On April 12, 1978, Daniel Drake was observed inside the office of W. C. I. Laboratories, the Wyvern Co. washing glassware, and opening the boxes delivered from S. G. A. Scientific Inc., 735 Broad Street, Bloomfield, New Jersey.

7. Drake was observed leaving the laboratory at approximately 2:25 P.M. after entering a brown 1978 Chrysler New Yorker license no. 150 B.B.W. he drove in a northerly direction to Bishop-Allen drive and turned east where he then turned right on Columbia Street heading south to Massachusetts Avenue. He turned right on to Massachusetts Avenue and proceeded to circle the same City block two additional times.

8. After entering Massachusetts Avenue, Drake turned right and headed West toward Harvard Square then abruptly made a U turn on Massachusetts Avenue heading East toward Boston traveling at approximately 5 m.p.h. and was observed watching through his rear view mirror. Surveillance was then stopped.

9. From April 12, 1978 through April 19, 1978 periodic surveillance was conducted of W. C. I. Laboratories, the Wyvern Co. by DEA agents and no activity at the laboratory was observed.

10. On April 28, 1978 at 12:30 a. m. Drake was observed by me to enter 639 Massachusetts Avenue, the commercial building where W. C. I. Laboratories, the Wyvern Co. is located. At 8:30 a. m., I then entered 639 Massachusetts Avenue and observed glassware on the chemistry work bench which is situated inside the W. C. I. Laboratories, the Wyvern Co., Room 301.

11. At approximately 9:30 a. m., Special Agent Albert Duffy saw the door to Room 301 open and took several photographs of the interior to Room 301 which displayed the chemistry bench and assorted glassware, tubing and what appeared to be chemicals which were located on the bench.

12. At 12:00 p. m. on April 28, 1978 I spoke with D.E.A. forensic chemist J. Fasanello who reviewed the above-mentioned facts and circumstances including the purchases of the chemicals Phenyl 2-propanone and méthylamine and the laboratory equipment described above. The chemist has stated to me that the necessary chemicals which have direct application in the synthesis of amphetamine or methamphetamine are Phenyl 2-propanone, Methylamine, Formic Acid, Benzene, Sodium Hydroxide, Sodium Sulfate, Ammonium Hydroxide, Ether, Methanol, Sulfuric acid, Potassium Hydroxide, and carbon decolorizing, which were purchased by Daniel I. Drake and the W. C. I. Laboratories, the Wyvern Co. Inc. Furthermore, that Lactose and Dextrose which was also purchased by Drake are common cutting materials in the manufacturing of methamphetamine. D. E. A. Forensic Chemist J. Fasanello has stated that he has been a forensic chemist for eight years. He has a B. S. degree in chemistry. That he has been the Clandestine Laboratory Coordinator for the Northeast Regional Laboratory of DEA for four and one half years. He has been involved in the synthesis of drugs such as Amphetamine and Methamphetamine. He has also trained state and federal agents in the seizure of laboratories. He has been involved in the seizure of approximately 40–50 Clandestine Laboratories, 50 percent involving either Amphetamine or Methamphetamine.

13. On Sunday, April 30, 1978 Special Agent Duffy and detective Gilliam, Cambridge, Massachusetts Police Department observed Drake enter room 301 the W. C. I. Laboratories, the Wyvern Co. of 639 Massachusetts Avenue, Cambridge, Massachusetts at about 6:00 a. m. Drake remained inside room 301 until 7:55 p. m. on April 30, 1978. At this time I observed Drake leaving room 301 and was also able to observe inside the laboratory. I saw a tri neck flask with stoppers in all three necks along with other lab equipment. After describing these observations to DEA Chemist J. Fasanello, he

stated that in his expert opinion, based on all observations related to him, Drake had only one more step in the process to take the amphetamine free base to its crystal form.

14. On May 1, 1978, I spoke to J. Fasanello DEA Forensic Chemist who stated to me that in his opinion and experience (P2P) Phenyl 2-propanone and methylamine in combination can only be used to manufacture methamphetamine, a controlled substance.

JOSEPH CROWE,
Special Agent, DEA

Subscribed and sworn to before me this 1st day of May, 1978.

U.S. Magistrate.