**UNITED STATES of America, Appellee,**

v.

**Andrews Bruce CAMPBELL,
Defendant, Appellant.**

No. 87–2013.

United States Court of Appeals,
First Circuit.

Heard Jan. 9, 1989.

Decided May 10, 1989.

As Amended May 10, 1989.

Douglas C. Marshall, by Appointment of the Court, with whom Marshall, Rosen & Marshall, Boston, Mass., was on brief, for defendant, appellant.

Nicholas M. Gess, Asst. U.S. Atty., Portland, Me., with whom Richard S. Cohen, U.S. Atty., Augusta, Me., and Jonathan R. Chapman, Sp. Asst. U.S. Atty., Portland, Me., were on brief, for the U.S.

Before BOWNES and SELYA, Circuit Judges, and PETTINE,** Senior District Judge.

BOWNES, Circuit Judge.

The defendant-appellant, Andrews Bruce Campbell, an attorney and member of the Maine Bar, was convicted of conspiracy to possess with intent to distribute marijuana in violation of 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D) & 846, and of possession with intent to distribute marijuana in violation of 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). At trial, the

** Of the District of Rhode Island, sitting by desig-

defendant admitted to the alleged criminal conduct but asserted the defense of entrapment. He now appeals alleging numerous grounds for reversal. We affirm the convictions.

## I. FACTS AND PROCEEDINGS BELOW

We recite the facts in the light most favorable to the prosecution. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Indorato,* 628 F.2d 711, 713 (1st Cir.1980).

On December 17, 1986, Sylvia Lane, a long-time drug user and seller, was stopped for a traffic violation in Gray, Maine. The officer at the scene discovered drugs and called in Special Agent Patrick M. Lehan of the Cumberland County Task Force, which is a joint federal-state drug investigation unit. Agent Lehan arrived and asked Lane if she wished to cooperate and provide the government with the names of her suppliers and of other drug sellers. She declined the offer and was arrested and booked on drug trafficking charges. She was subsequently released on bail.

During this period of release, Lane became concerned over what would happen to her invalid son, of whom she had sole care, if she went to jail as a result of her arrest. Between December 17, 1986 and January 5, 1987, she telephoned Agent Lehan to discuss whether she could get her charges dismissed if she cooperated. Lehan told her that he would discuss it with the district attorney.

At about this same time, Lane's prior drug dealings had placed her in an even more precarious position. She had used the proceeds from various drug sales to pay for her bail and the bail of other incarcerated family members. This money was supposed to have gone to her supplier, Juan Manuel Alfonso, to pay for previous orders of marijuana and cocaine. Since Manuel Alfonso was a renowned and ruth-

nation.

less drug operator, Lane feared physical violence unless she could come up with his money.

Campbell had represented one of Lane's sons in an unrelated criminal case. This son suggested to his mother that Campbell might loan her some money to help pay off her debt to Manuel Alfonso. In early January, 1987, Lane telephoned Campbell from a shopping center in Topsham, Maine, and set up a meeting at a nearby McDonald's restaurant. In response to Lane's request for a loan, Campbell asked her if it would help if he "fronted"[1] her some marijuana. He suggested that he could provide her with a few pounds of marijuana at $1,000 per pound. Lane had not mentioned selling drugs to Campbell before that time, but when he offered the transaction she accepted. Campbell then took Lane to a motel room in a nearby town to meet a man named "Dave." After Campbell had vouched for Lane's credibility, Dave gave her three one-pound bags of marijuana.

Lane immediately sold one of the bags in Lewiston, Maine but left the other two with a friend. Soon these two bags were divided up and used to pay off debts Lane had with people in the area. Lane did not use any of the marijuana to reduce her debt with Manuel Alfonso, and her fear for her personal safety and that of her family increased.

Lane contacted Agent Lehan again, telling him of her predicament and of her dealings with "Dave" and Campbell. Lane agreed to cooperate with the government and to attempt to arrange an undercover deal to buy marijuana from the appellant.

On January 12, 1987, Lane, fitted with a body wire, met Campbell at his office to pay the $1,000 she owed him for the pound of marijuana she had sold. Also in attendance was Donald Lagasse. As part of the sting operation, Lane told Campbell that she had a buyer who wanted to buy ten pounds of marijuana. Since Campbell and Lagasse did not know that Lane had distributed the other two pounds of marijuana, she informed them that the buyer would accept those two pounds along with eight additional pounds to fill his ten-pound order. She also stated that this buyer could handle over one hundred pounds of marijuana if this deal went through smoothly. The two were interested in the deal but Campbell did not want to be physically present at the exchange because, as an attorney, he had too much to lose if he got caught. Lane, however, insisted that he be present and Campbell acquiesced. The exchange was set up for the following day.

As the deal was planned, Lane and her purported buyer, Agent Lehan, would rent a room at a hotel as would Campbell and Lagasse. Lane would be the go-between; she would check the quality of the marijuana, and, if all was satisfactory, she would bring Campbell and Lagasse the money.

On January 13, 1987, the day of the exchange, Lehan picked up Lane and drove her to the hotel where the purported sale was to take place. A number of law enforcement officers staked out the location. After Lane and Lehan had arrived at the hotel, Lane, again fitted with a body wire, went to Campbell's hotel room. Lagasse and Campbell were in the room; they had, as agreed, eight pounds of marijuana. Lane inspected the quality and asked to take one pound back to show her buyer. Lagasse and Campbell agreed. Lane left with the marijuana and showed it to Lehan. He then ordered the arrest of Campbell and Lagasse.

At his trial, Campbell acted as his own attorney and argued that he had been entrapped. He contended that Lane, acting as a government agent, had induced him to engage in criminal activity out of sympathy for her predicament. Absent such compassion, he maintained, he never would have sold marijuana. He also argued that he had been the target of government investigation due to his representation of criminals in a number of high profile cases. The jury was instructed on the entrapment defense and returned a verdict of guilty.

---

**1.** To front someone drugs is to give them the drugs with no money down on the understanding that after a quick sale of the merchandise the supplier would receive payment.

Campbell now appeals alleging the following grounds: (1) the trial judge gave an erroneous instruction regarding reasonable doubt; (2) the judge erred in his entrapment instruction; (3) his sixth amendment rights were transgressed because he did not knowingly and intelligently waive his right to counsel in deciding to proceed *pro se,* because the court appointed standby counsel over his objection, and because he was not allowed to have counsel of choice, but was forced to have standby counsel whom he distrusted; (4) the district court unfairly prejudiced him by refusing to allow him to submit an alternative transcript of a tape recording to the jury; and (5) the court erred in allowing the government's motion to quash the subpoena of GI—a secret government informant—and this prejudiced defendant's ability to show a pattern of governmental targeting. We deal with each of these contentions in turn.

## II. THE REASONABLE DOUBT INSTRUCTION

■ Appellant's first assignment of error is that the trial judge's explanation of guilt beyond a reasonable doubt failed to instruct the jury correctly on the government's burden of proof. Since defendant did not make a specific objection to the reasonable doubt instruction, we review it only for plain error. *See* Fed.R.Crim.P. 30; *Aurora Figueroa v. Aponte–Roque,* 864 F.2d 947, 951 (1st Cir.1989); *Kelley v. Schlumberger,* 849 F.2d 41, 44 (1st Cir. 1988); *United States v. Munson,* 819 F.2d 337, 345 (1st Cir.1987); *United States v. Indorato,* 628 F.2d 711, 721 (1st Cir.1980). Although we see some deficiencies in the judge's instructions, we cannot say any of them amount to plain error.

The district judge instructed the jury three times concerning the standard of reasonable doubt. The first instruction came as a precharge to the jury.

As I told you earlier, this is a criminal case in which the defendant is presumed innocent until proven guilty. The indictment which has been brought against the defendant is only an accusation and nothing more, it is not proof of guilt, or anything else. The defendant starts out here with a clean slate and the burden of proof remains on the government until the conclusion of the trial. The defendant is not required to present any testimony or to interpose any proof with respect to innocence, to present any evidence, or to testify himself. Since he has the right to remain silent, the law in the United States prohibits the jury in arriving at its verdict from considering the fact that he may not have testified.

The government is required to prove every essential element of the offenses charged against the defendant beyond a reasonable doubt.

A reasonable doubt is a fair doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act. It does not mean proof beyond all doubt, for rarely can anything be proven to an absolute certainty. The essence of the reasonable doubt standard is that the guilt of the accused must be established based upon admissible evidence and the proper inferences drawn therefrom.

In his opening, defendant attempted to define reasonable doubt in terms of proof "to a moral certainty" and a doubt that would cause a reasonable person to hesitate to act in the "most serious of your affairs." We have expressed our displeasure with these explanations of reasonable doubt numerous times. *See United States v. Sorrentino,* 726 F.2d 876, 882–83 (1st Cir.1984); *United States v. Cranston,* 686 F.2d 56, 62 (1st Cir.1982); *United States v. Del Toro Soto,* 676 F.2d 13, 17 (1st Cir. 1982); *United States v. Drake,* 673 F.2d 15, 21 (1st Cir.1982); *United States v. Indorato,* 628 F.2d 711, 721 n. 8 (1st Cir. 1980); *Dunn v. Perrin,* 570 F.2d 21, 24 n. 5 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978). The prosecution, sensing the possible confusion created by the defendant's opening, requested and received curative instructions on the standard of reasonable doubt.

One of the most confusing issues in any criminal trial, ladies and gentlemen, is what is a reasonable doubt. And, I

want you to understand that on this issue I am the boss. There has been some talk here in the course of opening statements about moral certainty in serious affairs. That is not the definition.

I will repeat what I said earlier: A reasonable doubt is a fair doubt based on reason and common sense, the kind of doubt that would make a reasonable person hesitate to act. It does not mean proof beyond all doubt, for rarely is anything proven to an absolute certainty. The essence of the reasonable doubt standard is that guilt of an accused must be established based on admissible evidence and proper inferences therefrom permitted by the rules of law.

The judge's final explanation of reasonable doubt came in his formal charge at the conclusion of the trial. He stated:

The law in the United States of America presumes every defendant to be innocent of crime, and this presumption of innocence can be overcome only when the government by means of competent evidence satisfies its burden of convincing the jurors beyond a reasonable doubt of the guilt of the defendant with respect to every element of the offenses with which the defendant has been charged. This presumption of innocence remains with the defendant throughout the course of his trial.

A reasonable doubt is a fair doubt based on common sense, the kind of doubt that would make a reasonable person hesitate to act. It is not a mere possible, or imaginary doubt, or a bare conjecture, it does [not] mean proof beyond all doubt, for rarely can anything be proven to an absolute certainty. The essence of the reasonable doubt standard is that criminal guilt must be established based not on speculation or intuition, but upon admissible evidence and the proper inferences permitted by law. The law

never imposes upon the defendant the burden or duty of producing any evidence, so a reasonable doubt may arise, not only from the evidence which has been produced, but also from a lack of evidence.

The prosecution must prove beyond a reasonable doubt as to the defendant every essential element of the offenses with which the defendant is charged. The defendant has the right to rely upon the failure of the prosecution to establish its proof, and the defendant may also rely upon evidence which has been brought out on cross-examination of witnesses presented by the prosecution.

A criminal defendant is entitled to an instruction that " 'adequately apprise[s] the jury of the reasonable doubt standard.' " *United States v. Johnston,* 784 F.2d 416, 426 (1st Cir.1986) (quoting *United States v. Drake,* 673 F.2d at 21). In this case we believe the judge's instructions, taken as a whole, *see Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed. 2d 368 (1973), detailed the appropriate standard to the jury. He described the presumption of innocence and the heavy burden that is placed on the prosecution. He then noted that nothing can be proven to an absolute certainty but that guilt in criminal cases must be established beyond a reasonable doubt. We find no plain error in this charge.[2]

■ We pause, however, to note one troubling portion of the judge's charge. The jury instructions continually equated a reasonable doubt with "a fair doubt." We are aware that past decisions in this circuit and others have upheld charges containing this language. *See United States v. Hall,* 854 F.2d 1036, 1038–39 (7th Cir.1988); *Munson,* 819 F.2d at 345–46; *Del Toro Soto,* 676 F.2d at 17; *United States v. Patman,* 557 F.2d 1181, 1182 (5th Cir.

2. Because we find that the judge's charge does not constitute plain error, we do not reach the more difficult question of whether harmless error review would apply to an erroneous reasonable doubt instruction. *See Lanigan v. Maloney,* 853 F.2d 40, 48–50 (1st Cir.1988) (discussing applicability of harmless error standard to review of reasonable doubt instruction); *see also*

*Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 1921–22, 95 L.Ed.2d 439 (1987) (applying harmless error standard to review conviction based on improper jury instruction as to an element of the offense); *Rose v. Clark,* 478 U.S. 570, 576–79, 106 S.Ct. 3101, 3105–07, 92 L.Ed.2d 460 (1986) (same); *United States v. Doherty,* 867 F.2d 47, 57–58 (1st Cir.1989) (same).

1977). Two of these decisions have noted that "a fair doubt" could impose a lesser burden on the prosecution. *See Hall*, 854 at 1039; *Patman*, 557 F.2d at 1182. We too see such a possibility. The equation of reasonable doubt with a fair doubt should be eschewed in the future. We have covered this problem before:

> Despite the importance of the reasonable doubt standard in safeguarding the rights of criminal defendants, the term has eluded clear definition. Judges and jurors repeatedly witness the truth of the Supreme Court's statement that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." *Miles v. United States*, 103 U.S. (13 Otto 304) 304, 312, 26 L.Ed. 481 (1880). *Accord United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.) ("It can be said beyond any doubt that the words 'reasonable doubt' do not lend themselves to accurate definition."), *cert. denied*, 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984).
>
> Most efforts at clarification result in further obfuscation of the concept. Many definitions reduce the burden of proof on the government by expanding the degree of doubt permissible, *United States v. MacDonald*, 455 F.2d 1259, 1263 (1st Cir.), *cert. denied*, 406 U.S. 962, 92 S.Ct. 2073, 32 L.Ed.2d 350 (1972), and consequently such definitions result in increased appellate litigation. *Id.; United States v. Gibson*, 726 F.2d at 874 ("*[A]ny attempt to define 'reasonable doubt' will probably trigger a constitutional challenge.*" (citing *United States v. Drake*, 673 F.2d 15, 20–21 (1st Cir. 1982)).

*United States v. Olmstead*, 832 F.2d 642, 645 (1st Cir.1987) (emphasis added). We reiterate that the words "reasonable doubt" need no defining or refining.

### III. THE ENTRAPMENT INSTRUCTION

■ Appellant next argues that the lower court improperly charged the jury on the defense of entrapment. The defendant objected to the instructions at trial and now restates his argument that the charge failed to take into account the Supreme Court's decision in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

A "valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988) (collecting authorities); *see also United States v. Rodriguez*, 858 F.2d 809, 812 (1st Cir.1988) (noting same). In *Sherman v. United States*, a frequent government informant approached the defendant, who was participating in a drug rehabilitation program, and asked for his assistance in obtaining narcotics. The defendant refused a number of times. The informant then begged for drugs stating that he was in constant physical pain from withdrawal. Finally, the defendant agreed to and did help him obtain drugs. The informant then turned the defendant over to the authorities. The Court held:

> The case at bar illustrates an evil which the defense of entrapment is designed to overcome. The government informer entices someone attempting to avoid narcotics not only into carrying out an illegal sale but also into returning to the habit of use. Selecting the proper time, the informer then tells the government agent. The setup is accepted by the agent without even a question as to the manner in which the informer encountered the seller. Thus the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted. Law enforcement does not require methods such as this.

*Id.* 356 U.S. at 376, 78 S.Ct. at 822.

Comparing himself to the defendant in *Sherman*, appellant argues that he had no predisposition to commit these crimes but instead was induced to commit them out of sympathy for the plight of Sylvia Lane. *See United States v. McLernon*, 746 F.2d 1098, 1109 (6th Cir.1984). Appellant thus contends that Lane was, in all her dealings

with the defendant, acting as a government agent. He concludes that Lane's statements concerning her financial woes and fears of physical harm must be seen as improper law enforcement inducements that establish an entrapment defense. He alleges error in the jury instructions because they did not expressly state this theory or the holding of *Sherman*. We believe the judge's charge was accurate and correct.

We note first that the "trial court's charge to the jury need not follow the exact form and wording of the defendant's proposed instructions." *United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.1984) (citing *United States v. Morris*, 700 F.2d 427, 433 (1st Cir.), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983)). "It is enough that the charge adequately and correctly covers the substance of the requested instructions." 2 C. Wright, *Federal Practice and Procedure* § 482, at 688–89 (1982) (collecting authorities).

The jury was instructed as follows on the defense of entrapment:

Defendant, Andrews Bruce Campbell, does not dispute that he was present when the marijuana was seized, nor does he argue that he did not know such marijuana was intended for sale. He relies under a defense which is well recognized in the law of the United States, and that defense is that his participation in this venture was brought about by entrapment on the part of government law enforcement agents, federal and state.

Where law enforcement officials, acting either directly or through an agent, induce or persuade an otherwise unwilling person to commit an unlawful act entrapment is established. An accused so entrapped is entitled to verdicts of acquittal.

However, where a person is predisposed to commit an unlawful act, that is, such person is ready and willing to violate the law, the fact that government officials or their agents afford him the opportunity to do so, does not constitute the offense of entrapment. Otherwise stated, entrapment exists when the offenses with which the defendant is charged were instigated by law enforcement officers and the defendant had no previous disposition [sic] to commit such [offenses]. Merely affording the defendant the opportunity for commission of the offense, however, does not constitute entrapment.

The burden of demonstrating the predisposition of the defendant to commit the offense charged is placed upon the Government beyond a reasonable doubt. The focus of the jury in assessing the predisposition of the defendant should be on the defendant's state of mind prior to the inducement. If the evidence leaves the jury with a reasonable doubt whether the defendant had a prior intent or purpose to commit the criminal offenses with which he has been charged then it is the duty of the jury to find the defendant not guilty.

In assessing predisposition the totality of the circumstances should be considered. Of course, if inducements or persuasion by law enforcement agents is not the cause of the defendant's participation in the criminal offenses, the opportunities afforded by law enforcement to permit the defendant to commit such offenses are broad in scope, including the use of undercover agents, furnishing of funds for purchase of controlled substances, and the adoption of false identity.

This correct and clear instruction specifically addressed the defendant's theory of the case. It stated that "where law enforcement officials, acting either directly *or through an agent*, induce or persuade...." This allowed the jury to conclude, as the defendant urged, that Lane was acting as a government agent even when she first approached him. We cannot assign error to a charge that adequately details both the applicable law and the defendant's theory of the case to the jury. *See United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973) ("It is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.").

The prosecution has suggested that the defendant did not even merit an instruction on entrapment, since he produced absolutely no evidence that would show government inducement and lack of predisposition. It is the rule in this circuit that the defendant merits an entrapment instruction only if he first produces some evidence that "fairly supports the claims of both government inducement of the crime and defendant's lack of predisposition to engage in it." *United States v. Rodriguez*, 858 F.2d at 814; *see United States v. Polito*, 856 F.2d 414, 416 (1st Cir.1988); *United States v. Murphy*, 852 F.2d 1, 4–5 (1st Cir.1988); *United States v. Coady*, 809 F.2d 119, 122 (1st Cir.1987); *United States v. Fera*, 616 F.2d 590, 596 (1st Cir.1980); *see also Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988) (noting there must be sufficient evidence of entrapment to get to the jury). We find that the defendant made an adequate evidentiary showing and was entitled, therefore, to a jury determination of the entrapment defense.

## IV. THE DEFENDANT'S SIXTH AMENDMENT RIGHTS

The defendant argues that the district court denied him his sixth amendment right to counsel by: (1) allowing him to proceed *pro se* without making a finding that he knowingly and intelligently waived his right to representation; (2) appointing Joseph H. Field, Esquire, as standby counsel despite defendant's objection; and (3) denying defendant's motion to replace Field with another attorney with whom he was more comfortable.

### A. *Defendant's Waiver of Right to Counsel*

Defendant contends that the district court violated his sixth amendment rights by failing to make a finding that his waiver of counsel was knowing and intelligent. The fact that there was a question as to his mental stability, the defendant asserts, makes the absence of such a finding even more egregious. We believe the district court acted properly. In *Faretta v.*

*California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court addressed the issue of waiving the sixth amendment right to counsel and stated:

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forego those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."

*Id.* at 835, 95 S.Ct. at 2541 (citations omitted). The defendant argues that some of the Court's decisions imply that the district judge must make a finding on the record that the defendant has knowingly and intelligently waived his sixth amendment rights before allowing him to proceed *pro se. See, e.g., Von Moltke v. Gillies*, 332 U.S. 708, 722–24, 68 S.Ct. 316, 322–23, 92 L.Ed. 309 (1948) (plurality opinion of Black, J.); *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

This circuit, however, "has not interpreted these decisions to mean that the district court must issue a particular warning or make specific findings of fact before it allows the defendant to proceed pro se." *United States v. Hafen*, 726 F.2d 21, 25 (1st Cir.1984); *see Tuitt v. Fair*, 822 F.2d 166, 176 n. 3 (1st Cir.1987). While we believe such on the record findings are almost always wise, they are not mandated. *See United States v. McDowell*, 814 F.2d 245, 249–50 (6th Cir.1987) (collecting authorities); *Hafen*, 726 F.2d at 26. We delineated the waiver requirements in *Maynard v. Meachum*, 545 F.2d 273, 279 (1st Cir.1976):

> An intelligent waiver does not require that the accused have the skill or knowledge of a lawyer, *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525 [2541], 45

L.Ed.2d 562 (1975). What is required, we think, is a sense of the magnitude of the undertaking and the "disadvantages of self-representation", *id.:* an awareness that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story. *See Hodge v. United States,* 414 F.2d 1040, 1043 (9th Cir. 1969). In addition, the accused should have a general appreciation of the seriousness of the charge and of the penalties he may be exposed to before deciding to take a chance on his own skill. *Cf. Von Moltke v. Gillies, supra,* 322 [332] U.S. at 723–24, 68 S.Ct. 316 (plurality opinion of Black, J.). *See Spanbauer v. Burke, supra,* 374 F.2d [67] at 71–74 [7th Cir.1966]. We repeat, however, that the defendant's knowledge of these relevant facts need not appear on the record at trial, *id.* at 74. The district court may properly consider, in addition to Maynard's background, experience and conduct, *Johnson v. Zerbst, supra,* 304 U.S. at 464, 58 S.Ct. 1019 [at 1023], such factors as his involvement in previous criminal trials, his representation by counsel before trial, and the continued presence of advisory counsel at trial in determining whether he understood what he was getting into. *See United States v. Rosenthal, supra,* 470 F.2d [837] at 845 [2nd Cir.1972]; *United States v. Odom,* 423 F.2d 875 (9th Cir.1970).

In other words, to assess the validity of a waiver of right to counsel, we look to "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). If there is some " 'affirmative acquiescence' in the arrangements at trial, the burden falls on [the defendant] to show that his 'acquiescence was not sufficiently understanding and intelligent to amount to an effective waiver.' " *Maynard,* 545 F.2d at 277 (quoting *Carnley v. Cochran,* 369 U.S. 506, 516–17, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962)).

We believe the totality of the evidence shows that Campbell knowingly and intelligently waived his right to counsel. Campbell was a member of the Maine Bar and had tried numerous criminal cases in both state and federal court. We think it highly improbable that one with such experience in the criminal justice system and knowledge of the law could be ignorant of the effect of a waiver of legal representation. *See Hafen,* 726 F.2d at 25 (noting that defendant's knowledge of law is a factor weighing in favor of a valid waiver); *United States v. Bailey,* 675 F.2d 1292, 1301–02 (D.C.Cir.1982) (same). Based on his practice at the criminal bar, Campbell certainly knew of the gravity of the charges facing him and of the types of defenses available to him. *See Maynard,* 545 F.2d at 279. His decision to represent himself was made with eyes wide open and with knowledge of the possible repercussions of such a choice. *See Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541; *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942); *United States v. Pina,* 844 F.2d 1, 6 n. 3 (1st Cir.1988).

The defendant argues that since questions were raised concerning his mental stability, the judge's failure to make on the record findings concerning his waiver is even more suspect. He asserts that he was not competent to knowingly waive his right to counsel. We disagree. The government asked that the defendant be given a competency evaluation before trial. The district judge denied the motion, and found Campbell to be competent:

> I'm going to deny the motion for a study and a hearing on competency pursuant to 18 U.S.[C]. 4241 and 4247. In my experience, he [the defendant] knows what's going on. He knows better than you do. That's part of the problem maybe, but that's neither here nor there, and he's perfectly capable to defend himself on the indictment charges.

While the competency required to stand trial may not always be coterminous with the capacity necessary to proceed *pro se, see United States, ex rel. Konigsberg v. Vincent,* 526 F.2d 131, 133 (2d Cir.1975),

*cert. denied,* 426 U.S. 937, 96 S.Ct. 2652, 49 L.Ed.2d 388 (1976), in this circuit, when appellant "does not dispute that he was competent to stand trial; . . . the trial court [is] entitled to infer that he was also competent to waive his right to counsel." *United States v. Hafen,* 726 F.2d at 25. Here, as in *Hafen,* "appellant's counsel, who had represented him for several months and who was consequently in a better position than the trial court to assess his [the defendant's] mental state, made no objection to the validity of appellant's decision to proceed pro se." *Id.* Indeed, his standby counsel, Field, stated to the trial judge:

> Mr. Campbell, as you've had the opportunity to see, is a very articulate and intelligent person. His arguments are very well put and forcefully put and are backed by voluminous amounts of legal research, though they may be somewhat offbeat, if you will, but they are still cogently put and with adequate research and well represented.

We conclude that appellant effected a knowing and intelligent waiver of his sixth amendment right to counsel.

### B. *The Appointment of Field as Standby Counsel*

█ A brief recapitulation of the circumstances leading up to Field's appointment as standby counsel is necessary to understand the defendant's arguments. The defendant initially retained Field as his attorney but envisioned Field's role to be that of backup counsel. At a pretrial conference before a magistrate, defendant stated:

> Your Honor, I'm happy to have Mr. Field on as backup counsel, or should I reach a plea negotiation with the Government that was satisfactory to all concerned, I would probably have him represent me in that respect. Should I go to trial, well, I'd do it myself and have him help me.

As trial approached, the defendant failed to pay Field's fees and Field made a motion to withdraw. The magistrate allowed him to withdraw but ordered him to remain as standby counsel. The defendant objected to this because he no longer felt he could

financially afford the luxury of a standby attorney. Defendant also made known to the trial judge his objection to Field's continuing status as standby attorney. Due to the fact that he had not been paid and had not played a large role in the preparation of the defense, Field again requested that he be allowed to withdraw from the case. The trial judge denied the motion, noting that the assistance of standby counsel might become necessary during the trial. The judge also found that since the defendant had become indigent, Field's fees should be paid by the government.

Appellant maintains that the district court should not have appointed standby counsel over his objection. He asserts that Field had not followed his instructions concerning certain defense matters, and that, therefore, he did not trust him. Defendant's basic contention is that Field unduly interferred with his *pro se* defense. We do not agree.

In *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the Supreme Court made clear that while a defendant has a right to proceed *pro se,* "a defendant's sixth amendment rights are not violated when a trial judge appoints standby counsel—even over the defendant's objection. . . ." *Id.* at 184, 104 S.Ct. at 954; *see Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46; *United States v. Torres,* 793 F.2d 436, 441 (1st Cir.1986). Standby counsel cannot take over the defendant's case, however. The sixth amendment requires that the *"pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in *voir dire,* to question witnesses, and to address the court and the jury at appropriate points in the trial." *McKaskle,* 465 U.S. at 174, 104 S.Ct. at 949.

In the case at bar, the defendant had plenary control over the preparation and presentation of his defense. He argued before the jury, made motions and examined witnesses. The record shows that Field's role in the presentation of Campbell's defense was minimal. Given these

facts we cannot say the trial judge's appointment of standby counsel was error.

## C. *Denial of Defendant's Request to Replace Standby Counsel*

■ At the final pretrial hearing, held the day before the trial was to begin, defendant requested that Richard Garrity, a personal friend, be allowed to replace Field as standby counsel. The defendant stated that there was tension between Field and himself and that he desired a different standby counsel. Garrity was a former Assistant Attorney General in the state of Maine but would have required a *pro hac vice* dispensation to argue in the federal district court. The following colloquy ensued:

THE COURT: How old is Mr. Garrity?

MR. CAMPBELL: He's right here, sir.

MR. GARRITY: I'm 44.

THE COURT: Someone said you aren't practicing anymore. What are you doing?

MR. GARRITY: I have a small investment business in Albany, New York.

THE COURT: When was the last time you were in Court trying a case?

MR. GARRITY: Trying a case, about 25 years ago, maybe not, in Maine.

THE COURT: What have you been doing in the interim in 25 years, investments?

MR. GARRITY: I was in the army for awhile and—where I worked on a case against General Telephone and then I've been in investments since that time.

THE COURT: All right. Your request is denied, sir. Your objection is overruled. I'm not denigrating you at all, sir, but there's been a lot of changes in the law even through the nine years I've sat as a Federal Judge.

MR. CAMPBELL: Your Honor, I have a Sixth Amendment right to counsel—

THE COURT: If you want to talk to Mr. Garrity, sir, at your convenience or at a recess or anything, I have no problem, but I under the Criminal Justice Act have appointed Mr. Field who is a current practicing member of this bar with adequate experience to be paid thereunder in light of what's on file in record here, and I'm going to hold to that; and your objection to that ruling can be addressed with any others you have in a higher Court than this, and I'm not going to appoint Mr. Garrity, who has not been in active practice for 25 years at this point in the proceedings. Your objection to that ruling here is noted.

*Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) held that "a defendant should be afforded a fair opportunity to obtain counsel of his choice." *Id.* at 53, 53 S.Ct. at 58; *see Morris v. Slappy,* 461 U.S. 1, 21–23, 103 S.Ct. 1610, 1621–22, 75 L.Ed.2d 610 (1983) (Brennan, J., concurring) (collecting cases concerning defendants' right to have counsel of choice). This does not mean that a defendant may retain any counsel at any time he wishes; there are limits to a defendant's right to counsel of choice.

A criminal defendant's exercise of this right cannot unduly hinder the fair, efficient and orderly administration of justice. *United States v. Diozzi,* 807 F.2d [10] at 12 [1st Cir.1986]; *United States v. Allen,* 789 F.2d 90, 92 n. 4 (1st Cir.), *cert. denied,* [479] U.S. [846], 107 S.Ct. 164, 93 L.Ed.2d 103 (1986); *United States v. Koblitz,* 803 F.2d 1523, 1528–29 (11th Cir.1986); *Sampley v. Attorney General of North Carolina,* 786 F.2d 610 (4th Cir.), *cert. denied,* [478] U.S. [1008], 106 S.Ct. 3305, 92 L.Ed.2d 719 (1986). An accused's right to choose his own counsel cannot be manipulated to delay proceedings or hamper the prosecution. When a defendant attempts to substitute counsel at the eleventh hour or in mid-trial, he must show good cause such as a conflict of interest, a breakdown in communication or an irreconcilable dispute with his attorney. *United States v. Torres,* 793 F.2d 436, 440 (1st Cir.), *cert. denied,* [479] U.S. [889], 107 S.Ct. 287, 93 L.Ed.2d 261 (1986); *Wilson v. Mintzes,* 761 F.2d [275] at 280–81 [6th Cir.1985]; *United States v. Morris,* 714 F.2d 669, 672–73 (7th Cir.1983).

*United States v. Panzardi Alvarez,* 816 F.2d 813, 816 (1st Cir.1987).

The case at bar is different from those discussed above because it involves standby counsel. The defendant asserts that he has a right to counsel of choice to serve as standby counsel. Whatever the parameters of such a right might be, we believe the district judge had compelling reasons for denying the defendant's request. A standby counsel's job is to assist the defendant in procedural matters with which he may not be familiar and to facilitate a speedy and efficient trial by avoiding the delays often associated with *pro se* representation. *See McKaskle,* 465 U.S. at 184–85, 104 S.Ct. at 954; *Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46; *United States v. Norris,* 780 F.2d 1207, 1211 (5th Cir.1986).

Garrity would have been ill-prepared to advise the defendant concerning defense matters or to take over the presentation of the defense if the appellant so desired. While the defendant may have trusted Garrity more than he did Field, Garrity had not been in a courtroom for over twenty-five years. He had no knowledge of recent developments in either Supreme Court or First Circuit precedent concerning criminal law and procedure. The Federal Rules of Evidence were enacted after Garrity stopped practicing law. Perhaps most importantly, Garrity had no knowledge of this case. The defendant made the request for the substitution of Garrity for Field as standby counsel the day before trial was to begin. Despite defendant's protests that he was prepared to begin the next day, to be of any help Garrity would have required some time to familiarize himself with the past history and present posture of the case. The possibilities for trial delays associated with such a standby counsel seem especially compelling. Given the "eleventh hour" notice of the defendant's request and Garrity's long unused skills, we believe the district court was correct in insisting on Field as standby counsel. *See Panzardi,* 816 F.2d at 816; *United States v. Gipson,* 693 F.2d 109, 112 (10th Cir.1982); *Norris,* 780 F.2d at 1211; *Maynard,* 545 F.2d at 278. *United States v. Rodriguez Vallejo,* 496 F.2d 960, 965 (1st Cir.1974).

## V. THE EXCLUSION OF DEFENDANT'S TRANSCRIPT

On January 12 and January 13, 1987, the government recorded two meetings at which Lane, Campbell and Lagasse discussed and planned their marijuana transaction. At a pretrial hearing the day before opening statements, the government requested that it be allowed to submit transcripts of these recordings to the jury. The judge acquiesced. At this time, defendant did not mention that he wished to submit any alternative transcripts of these meetings. During the trial, the government introduced the tape recordings and provided transcripts to aid the jury in listening to them. The defendant then moved to submit an alternative transcript of the conversations to the jury. The trial judge denied the motion stating that providing the jury with two alternate transcripts would likely cause confusion and delay. The defendant objected and maintains that this decision denied him an opportunity to present his defense and to obtain a fair trial. We disagree.

"We have approved, as have most circuits, the use of transcripts as a jury aid in following tape recording playbacks." *United States v. Carbone,* 798 F.2d 21, 26 (1st Cir.1986) (collecting First Circuit authorities). The decision of whether to allow such transcripts to go to the jury is committed to the discretion of the trial judge, " 'so long as the court makes clear that the tapes not the transcripts constitute evidence in the case.' " *United States v. Rengifo,* 789 F.2d 975, 980 (1st Cir.1986) (quoting *United States v. Richman,* 600 F.2d 286, 295 (1st Cir.1979)); *see also United States v. Onori,* 535 F.2d 938, 948 (5th Cir.1976). Since the district judge informed the jury that the tapes—and not the transcript—were the controlling evidence in this case, we review his exercise of discretion only for abuse.

In this Circuit's seminal decision concerning the use of alternate transcripts we held:

[I]t is advisable for the district court to try to obtain a stipulated transcript from the parties before trial or, at least before a transcript is used. Failing such stipulation, each party should be allowed to introduce its own transcript of the recording provided that it is properly authenticated. When the jury receives two transcripts, of the same recording, it should, of course, be instructed that there is a difference of opinion as to the accuracy of the transcripts and that it is up to them to decide which, if any, version to accept. The jurors should also be instructed that they can disregard any portion of the transcript (or transcripts) which they think differs from what they hear on the tape recording. Further limiting instructions will depend on the circumstances of each case.

*Rengifo,* 789 F.2d at 983. The defendant's strategic decision to withhold the fact that he wished to present an alternative transcript foreclosed any possibility of a pretrial stipulation. We thus must consider whether the judge abused his discretion by not submitting *both* transcripts to the jury.

Neither at trial nor in his brief on appeal has defendant pointed to any substantive inaccuracies in the government's transcript. Our review of the tapes and the transcripts has likewise revealed no prejudicial differences. The sole allegation of error concerns the government's identification of one speaker. In one exchange, the government's transcript identifies Campbell as the speaker; defendant's transcript shows Lagasse as the speaker. The two transcripts read as follows:

*Government Transcript*

AC [Andrew Campbell] if you could get them for 950 would that alright (sic)

CI [confidential informant—Sylvia Lane] that would be cool, yep, if I can make the same $50 a pound then I'm happy

AC I think I can do (inaudible) like I said to them, they ain't I don't really get no cut until I get a hundred, then I can get something off of it.

*Defendant's Transcript*

DL [Donald Lagasse] If you can get them for $950 would that be alright?

SL [Sylvia Lane] That would be cool, yeah, if I can me the same $50 a pound, then I'm happy.

DL I think I can do business (inaudible) Like I said though, there ain't, I don't really get no cut ... until, I get $100 and then I can get something off of it ... the guys says it's 20.

The defendant alleges that the government's version is prejudicial since it implies that he was concerned with making a profit on the deal. The fact that he was not out to make a profit, the defendant asserts, makes his entrapment defense more plausible. *See Sherman,* 356 U.S. at 375 & n. 4, 78 S.Ct. at 822 & n. 4. Even assuming defendant's transcript to be the accurate one, we cannot conclude that this one divergence would have significantly affected the trial. The law does not distinguish between profit and not-for-profit drug dealing. It criminalizes the acts of both the greedy pusher and casual provider. While this distinction might have had some minimal probative significance concerning the defendant's entrapment defense, *see Sherman,* 356 U.S. at 375 & n. 4, 78 S.Ct. at 822 & n. 4, we do not believe this alone would make the district court's ruling an abuse of discretion.

Moreover, even if we were to find that it was an abuse of discretion, we would not overturn the verdict. Given the limited scope of the error and the fact that the judge instructed the jury that the tapes were the controlling evidence, we would find any error to be harmless beyond a reasonable doubt. *See Rengifo,* 789 F.2d at 982 (citing *United States v. Larson,* 722 F.2d 139, 145 (5th Cir.1983)).

## VI. THE DEFENDANT'S RIGHT TO COMPULSORY PROCESS

■ Defendant argues that the district court violated his sixth amendment right to compulsory process by quashing his subpoena of a confidential government informant (GI). The court quashed the subpoena because GI was the subject of a secrecy order and because his testimony could add nothing relevant and material to appel-

lant's defense. We believe the district court ruled properly.

To understand the link between appellant and GI we must begin in 1984. In June of that year, GI, a private investigator, was appointed by a Justice of the Maine trial court to do some investigatory work on one of Campbell's indigent cases. At this same time, Campbell was also representing another client in a federal-criminal action. During the course of pretrial activities in that case, the United States Attorney revealed to Campbell that GI was a government informant on an unrelated matter. The government then asked the district court for a secrecy order forbidding public disclosure of GI's name or his activities. The court granted the motion based on the importance of the information that GI was providing to the FBI and the danger to which GI would be subjected if his status became public knowledge. The court, however, allowed Campbell to conduct an investigation to determine whether any defense strategies or information had been leaked to the government through GI. Campbell could uncover no evidence of such a leak. Indeed, there is some indication in the record that Campbell told one of his clients that he believed GI's presence in his office was "an accident."

In the case at bar, Campbell attempted to subpoena GI. When asked what he hoped to elicit from GI, he responded:

> MR. CAMPBELL: Your Honor, my basic position is this, that a jury has the trial of the facts. They're allowed to make the inferences rather than The Court. I'm not asserting a civil rights act. I don't think I have the burden of showing a constitutional violation even. I have to be able to produce evidence which tends to make more probable the fact I assert of targeting.
>
> \* \* \* \* \* \*
>
> MR. CAMPBELL: He's going to add that the jury is going to see that I'm a lawyer that's been subject to constant governmental interest even since 1983 that no defense lawyer should have to bear up under, and that it suggests that the testimony that I expect the Govern-

ment to offer in this case that I was not targeted is not true. I don't have to accept—I don't understand that I do have to accept representations by the Government. I can just lie down and say, I give up, if that's the case.

As we understand it, Campbell was arguing that if the jury was made aware that a government informant had been working in his law office, it would infer that he had been the target of government investigations in the past and in this case. This inference would make his defense of entrapment more plausible.

The sixth amendment right to compulsory process is not absolute. Even where it is the government's actions that prohibit a witness from testifying, a defendant may compel the presence of a witness only if he can "make some plausible showing of how their testimony would [be] both material and favorable to his defense." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867 & n. 7, 102 S.Ct. 3440, 3446 & n. 7, 73 L.Ed.2d 1193 (1982); *see Washington v. Texas,* 388 U.S. 14, 16, 87 S.Ct. 1920, 1921, 18 L.Ed.2d 1019 (1967); *see also Roviaro v. United States,* 353 U.S. 53, 58–61, 77 S.Ct. 623, 626–28, 1 L.Ed.2d 639 (1957) (imposing standards, through its supervisory powers, for when the government must reveal the name of a confidential informant); *United States v. Ariza–Ibarra,* 651 F.2d 2, 13–15 (1st Cir.1981) (discussing *Roviaro* standards). This circuit has followed this teaching. *See United States v. Hoffman,* 832 F.2d 1299, 1303 (1st Cir.1987).

Campbell has failed to make a sufficient showing of how GI's testimony would be favorable and material to his case. GI was an informer on a specific matter wholly unrelated to the instant action. He worked for Campbell in 1984 and in September of that year Campbell learned that GI was an informer. The alleged criminal activity at issue here took place in January of 1987. There is no indication of any contact between the two in the months preceding Campbell's alleged criminal activities. Neither at the district level nor on appeal has Campbell been able to point to any poten-

tial testimonial evidence by GI that would be material and favorable to his defense.

Campbell's argument that the mere presence of GI in his office raises an inference that he was a continual target of government investigation does not change this result. First, although Campbell argued insistently that he had been a target of law enforcement, he proferred little (if any) evidence to support his bare allegations. Second, after reviewing the record of both this case and the cases involving GI, we do not believe that a jury could properly infer—solely from Campbell's use of GI as an investigator—that Campbell had been the target of government investigations. We recognize that if the target claim could be substantiated, it would make Campbell's entrapment defense more plausible. But there is no evidence—direct or inferential—to support it.

## VII. CONCLUSION

Based on the foregoing, we affirm the verdict and the rulings below.

So ordered.