UNITED STATES of America, Appellee,

v.

Lonnie BENEFIELD, Defendant, Appellant.

No. 90–2079.

United States Court of Appeals, First Circuit.

Heard May 10, 1991.

Decided Aug. 15, 1991.

---

Dana Alan Curhan, New Bedford, Mass., for defendant, appellant.

Michael J. Pelgro, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BREYER, Chief Judge, and ALDRICH and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

This appeal arises out of the July 1990 conviction of Lonnie Benefield for having been a felon in possession of a firearm on May 13, 1989, in violation of 18 U.S.C. § 922(g)(1). Defendant-appellant raises three issues before this court: (1) whether the district court improperly admitted evidence of his prior bad acts; (2) whether allowing him to proceed pro se violated his sixth amendment right to counsel; and (3) whether the district court erroneously amended his sentence after his period of confinement had begun, and once that is established, whether the sentence sought to be reinstated incorrectly failed to account for time served. We affirm on the issues of bad act evidence and pro se representation but find it necessary to reverse and remand for resentencing.

## FACTS

On Saturday, May 13, 1989, two individuals, identified later as Arnold Jackson and Lonnie Benefield, entered and robbed Spencer's Mystery Bookshop on Newbury Street in Boston, Massachusetts, while a third individual, identified as Hugh Reid, kept watch outside. Andrew Thurnauer was working in the bookshop at the time. Thurnauer observed that the individual identified as Jackson was a black male dressed largely in white, wearing thick glasses and a pith helmet. He noticed that the individual identified as Benefield was also a black male, wearing a hat, although not of the same style as Jackson, and a long, bluish-grey coat which partially concealed a shotgun. He did not see Reid.

Jackson and Benefield relieved Thurnauer of all of the bookshop's money, including the money in the register, money on Thurnauer's person, and $50 contained in a used envelope addressed to the bookshop. After the robbery was complete, Thurnauer was stashed in a back storage room. The robbers then exited the store.

In the meantime, Detectives Frederick Waggett and Stephen Blair of the Boston Police Department were making the rounds of Newbury Street on an armed robbery investigation when they noticed Reid pacing suspiciously outside the bookshop. They stopped approximately fifteen feet away and began watching Reid's actions more closely. They witnessed Reid enter the driver's side of a silvery-blue automobile double-parked on the street. They then saw Jackson appear from inside the bookshop and enter the automobile followed very shortly thereafter by Benefield. The detectives noticed that Jackson was wearing white clothes, glasses and a cream-colored pith helmet. They observed that Benefield was wearing a blue duster-style jacket and was carrying a shotgun. As the automobile pulled away, the detec-

tives pursued on foot. Detective Waggett was secured a description of the automobile and its license plate which he then broadcast over his police radio. Detective Blair entered the bookshop where he discovered Thurnauer and was informed of the robbery.

Officers Clifford Connolly and Michael Donovan responded to Detective Waggett's broadcast when they observed an automobile matching the escape car description travelling inbound on Commonwealth Avenue. The officers tailed the suspicious automobile for a short distance. The automobile then quickly accelerated, followed closely by the officers. When the police cruiser pulled abreast of the automobile, it swerved into the cruiser and both vehicles came to a stop. Jackson was detained in the automobile; Reid and Benefield attempted to escape on foot. Officer Connolly followed Benefield, whom he eventually found hiding under a parked car. A search of the area revealed a pouch containing shotgun shells under the car and cash totalling $321 along with an envelope addressed to Spencer's Mystery Bookshop on Benefield's person. Reid was similarly pursued and caught. A search of the suspects' automobile revealed a sawed-off shotgun secreted under the front passenger seat where Benefield had been riding.

Detectives Waggett and Blair arrived on the scene and identified the three individuals in custody as those connected with the bookstore robbery. Shortly thereafter, the police returned to the bookshop where the suspects were paraded in front of Thurnauer. Thurnauer identified Benefield and Jackson by their clothing. He was not, however, able to make a like identification at trial.

## PRIOR BAD ACTS

Detectives Waggett and Blair both testified at trial. The following statements were admitted. Over Benefield's objection, the detectives testified that they were patrolling Newbury Street because fifteen or sixteen armed robberies had recently occurred in the area. In addition, Detective Waggett stated that one of Benefield's companions resembled the description of an individual involved in some of the earlier robberies, while Detective Blair testified that he discovered Thurnauer in the storage room of the bookstore because he knew the modus operandi of the prior robberies was to place the employees in a back room. Benefield argues that the statements constituted Rule 404(b) evidence of prior bad acts, Fed.R.Evid. 404(b), which should not have been allowed either because they were improper under that particular rule[1] or because the likelihood of prejudice outweighed the probative value under Federal Rule of Evidence 403. We do not agree.

■ Rule 404(b) protects against the admission of "[e]vidence of other crimes, wrongs or acts ... *to prove the character of a person in order to show action in conformity therewith.*" (Emphasis added). The statements elicited from Detectives Waggett and Blair, however, did not fall within that rubric. The detectives' statements were offered to explain their reason for being in the area and to support their assertion of heightened awareness at the time of the bookstore robbery. They were not offered to show Benefield acted in conformity with some bad character trait. In fact, no effort was made to place Benefield at the scene of any of the prior robberies or otherwise to tie him to those robberies in any way. Thus Benefield's first argument fails.

■ Such a finding does not affect Benefield's Rule 403 argument, however.[2] Benefield maintains that even if the detectives' statements were admissible under

---

**1.** Benefield maintains the statements were improper either (a) because they were not offered to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, or (b) because the district court failed to provide a limiting instruction admonishing the jury to consider the testimony only for the purpose submitted and not to show conformity with the bad acts referenced therein.

**2.** Federal Rule of Evidence 403 provides in part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

Rule 404(b) (or otherwise), they were still excludable under Rule 403 because they were not necessary to the prosecution's case, whereas the likelihood of prejudice was overwhelming. Benefield's concern is that the jury believed he was somehow involved in the prior robberies and therefore assumed that he was guilty of the federal firearm charge as well. We review for abuse of discretion only. *Lubanski v. Coleco Industries, Inc.*, 929 F.2d 42, 45 (1st Cir.1991) (the district court has "broad discretion regarding the admissibility of evidence"). We consider first the statements of both detectives disclosing the fact that they were investigating prior robberies in conjunction with Detective Waggett's statement that one of Benefield's cohorts resembled an individual involved in some of the prior robberies. The identification of Benefield as the individual in possession of the shotgun was hotly contested during both state and federal court proceedings. The detectives' statements were offered to rebut Benefield's contention that they had only observed him fleetingly. The purpose was to show that the detectives were meticulously aware of activities in the Newbury Street area. Although the detectives did not clarify that they were not looking for Benefield in particular, neither did they attempt to link Benefield with any of the prior robberies. Any potential prejudice was therefore minimal while the probative value of the evidence was significant. Admission of the evidence clearly did not rise to the level of an abuse of discretion.

■ Next we consider Detective Blair's statement referring to the modus operandi of the previous robberies. Unlike the statements discussed in the previous paragraph, it was irrelevant and superfluous as it was neither probative on the issue of identification nor on any other trial issue. Nevertheless, the likelihood of prejudice was minimal. First, the statement was not solicited by the prosecution.[3] Second, it did not constitute a continuing theme throughout the trial. Detective Blair's statement

was the only evidence that came close to implicating Benefield in the earlier robberies. Third, the remaining evidence against Benefield was overwhelming. Most notably, there was significant eyewitness testimony against him (he was identified by Thurnauer, Waggett and Blair before trial and again by Waggett and Blair at trial). Thus any error which may have occurred, if indeed it did occur, was harmless. *See Lataille v. Ponte*, 754 F.2d 33, 37 (1st Cir.1985) (error is rendered harmless when we "can say 'with fair assurance ... that the judgment was not substantially swayed by the error'") (quoting *United States v. Pisari*, 636 F.2d 855, 859 (1st Cir.1981) (quoting *Kotteakos v. United States*, 328 U.S. 750, 756, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946))).

### PRO SE REPRESENTATION

Benefield represented himself at trial. He now maintains that his decision to do so was not knowing, voluntary and intelligent because he was unsophisticated in legal matters[4] and the district judge did not apprise him of the pitfalls of self-representation such as his limited access to legal materials[5] and the technical requirements of courtroom procedure. Benefield points to the following as evidence of his inability to proceed pro se: he failed to make an opening or closing statement, he did not cross-examine any of the government's witnesses, and he failed to call any of his own witnesses. While we agree that Benefield did not represent himself well, we nevertheless find that his decision to do so was knowing, voluntary and intelligent.

■ Although a criminal defendant has a right to legal representation under the sixth and fourteenth amendments, it is unconstitutional to force an attorney upon a criminal defendant "when he insists that he wants to conduct his own defense." *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975). The only requirement is that the court

---

**3.** The prosecutor asked Detective Blair *what* he did next; Detective Blair, however, responded *what* and *why*.

**4.** Benefield has only a seventh grade education.

**5.** Benefield was incarcerated pending trial.

ascertain whether the defendant's decision was made knowingly, voluntarily and intelligently. *United States v. Campbell*, 874 F.2d 838, 845–46 (1st Cir.1989). A specific finding on the record, however, is not necessary. *Id.* at 845. It is enough that the court has considered the "circumstances surrounding [the defendant's] case, [such as] the background, experience, and conduct of the accused." *Id.* at 846. The court may be persuaded by the defendant's "involvement in previous criminal trials, his representation by counsel before trial, and the continued presence of advisory counsel at trial." *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883–84, 68 L.Ed.2d 378 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938))); *see also Maynard v. Meachum*, 545 F.2d 273, 279 (1st Cir.1976) (delineating the following factors as relevant to the court's inquiry: (1) whether the defendant understands the "magnitude of the undertaking and the 'disadvantages of self-representation' "; (2) whether the defendant is aware "that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story"; and (3) whether the defendant appreciates the seriousness of the charge and its potential penalties) (citations omitted).

■ With respect to the instant case, the district court was aware that Benefield had been involved in numerous prior trials, including state court proceedings arising out of the same series of events as led to the federal firearm charge currently before us on appeal. During earlier state court proceedings, Benefield was represented by counsel, was present during evidentiary hearings, and received transcripts of the witness' testimony, which were later used in support of pre-trial motions before the federal court. Clearly Benefield was familiar with trial procedure and the effort required to defend a case. *See United States v. Bell*, 901 F.2d 574, 578 (7th Cir. 1990) (pro se defendant was "no stranger to the criminal justice system").

Benefield was also aware of the seriousness of the charges against him and the penalty attached thereto. In making an eleventh hour request for new counsel, he indicated that he understood the charges were serious and that a conviction would subject him to a sentence of "15 years to life." Benefield's decision was clearly knowing and intelligent. We need now only determine whether it was voluntary.

Benefield was originally represented before the federal court; however, he grew dissatisfied with his attorney's strategy. On the eve of trial he requested the appointment of new counsel. The district court complied, and trial was postponed. But Benefield did not remain satisfied for long. On the first day of trial, during jury selection, Benefield disrupted proceedings, again objected to representation by counsel, and this time insisted that he be allowed to proceed pro se. The court refused. Benefield did not give up. He subsequently filed a motion and affidavit stating that his attorney was ineffective, that he had objected in open court, and that the judge had wrongfully denied his request to proceed pro se. In essence, Benefield *demanded* to proceed without the benefit of counsel. *See United States v. Betancourt–Arretuche*, 933 F.2d 89, 92–93 (1st Cir.1991) (the defendant's request to proceed pro se must be accompanied by an unequivocal waiver of right to counsel). This time the court acquiesced; however, Benefield's attorney was permitted to remain as stand-by counsel. The court then discharged the jury and continued proceedings for two weeks, but warned Benefield that there would be no further continuances and that he must be ready to defend at the end of the two-week period.

During the interim, Benefield filed a request for voir dire and a request for jury instructions. As time passed, however, he began to feel less confident. At the end of the two-week period, he filed a motion to withdraw from pro se representation and to have stand-by counsel assume control. The district court refused, *see id.* at 94 ("a trial court has extensive discretion over 'eleventh-hour' requests for continuances in order to substitute counsel"), but later retracted from that position and offered stand-by counsel the opportunity to call and

cross-examine witnesses and to make a closing argument. *See id.* at 95 (hybrid representation is permissible if approved by the court). But Benefield objected. Thus, in essence, Benefield again asserted his desire to proceed entirely pro se. Such conscious, repeated and emphatic demands to represent himself clearly support the voluntary nature of his decision. *See United States v. Bailey,* 675 F.2d 1292, 1301 (D.C.Cir.), *cert. denied sub nom. Walker v. United States,* 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982).

Although Benefield's choice may not have been wise, it was nevertheless knowing, voluntary and intelligent. The fact that he was not a very effective advocate does not mean he was improperly permitted to proceed without the aid of counsel. *See Faretta v. California,* 422 U.S. 806, 834–35 n. 46, 95 S.Ct. 2525, 2540–41 n. 46, 45 L.Ed.2d 562 (1975) ("a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel' ").

## SENTENCING

■ When Benefield was convicted of the federal firearm charge in question, he was already serving a prison sentence for a state law violation arising out of the same series of events. The district court originally sentenced Benefield to 20 years imprisonment to be served concurrently with his state sentence. Five days later, however, the court amended that earlier sentence.[6] The federal sentence was modified to run consecutively to the state sentence. Both Benefield and the government agree that the amendment constituted error. Their analysis is correct.

While "[a] court may always correct an illegal sentence," *United States v. Bynoe,* 562 F.2d 126, 129 (1st Cir.1977), the original concurrent sentence in this case was lawful. *See* 18 U.S.C. § 3584(a) (granting district courts the option of imposing concurrent sentences); United States Sentencing

Commission, *Guidelines Manual,* § 5G1.3 and comment. (1990) (allowing district courts to impose federal sentences concurrent with state sentences). When an initial sentence is valid, " 'a second sentence [cannot] lawfully be imposed which increas[es] it or [makes] it more severe, once [the defendant has] commenced serving confinement under it.' " *Borum v. United States,* 409 F.2d 433, 440 (D.C.Cir.1967) (quoting *Tatum v. United States,* 310 F.2d 854, 855 (D.C.Cir.1962)), *cert. denied,* 395 U.S. 916, 89 S.Ct. 1765, 23 L.Ed.2d 230 (1969). "The general rule is that an increase in sentence after the defendant has commenced serving his punishment is a violation of [the] defendant's right not to be subject to double jeopardy." *Bynoe,* 562 F.2d at 128; *see also* 18 U.S.C. § 3582(c) ("the court may not modify a term of imprisonment once it has been imposed" except in very narrow circumstances to benefit the defendant or to correct a prior sentence imposed in violation of law or sentencing guidelines).

■ Since Benefield had already begun to serve his federal sentence when the district court issued its amendment, and the modification from a concurrent sentence to a consecutive sentence "had the necessary effect of increasing the aggregate term of imprisonment," *Borum,* 409 F.2d at 441, the amended sentence may not stand. Benefield does not, however, simply ask that the district court reinstate the original concurrent sentence. He also seeks credit for time served prior to sentencing. We agree that such time should be granted.

Benefield was being held in state custody for related state law violations when he was charged with the federal firearm violation currently before us on appeal. He was convicted in both fora. Credit for time served prior to sentencing was awarded against his state sentence. The district court, however, imposed a concurrent federal sentence without granting similar credit. While we appreciate that multiple credit for the same period of presentence incarceration is prohibited under certain

---

**6.** This was accomplished without explanation. The parties believe it arose from an erroneous reading of Sentencing Guidelines § 5G1.3. *See*

United States Sentencing Commission, *Guidelines Manual,* § 5G1.3 (1990).

circumstances, *see* 18 U.S.C. § 3585(b) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences ... that has not been credited against another sentence."); *United States v. Wilson,* 916 F.2d 1115, 1118 (6th Cir.1990) (presentencing custodial detention by the state court may be credited against a federal sentence; however, such credit may not be awarded if the time has already been used against another sentence), an across-the-board prohibition under all circumstances would lead to illogical results. For example, in the instant case any credit granted by the state court was rendered meaningless when not similarly reflected in Benefield's concurrent federal sentence. Thus, in order to avoid this unsuitable result, the federal court [7] should, on remand, impose a period of incarceration commensurate with Benefield's corresponding state sentence.

## CONCLUSION

In accordance with the preceding discussion, we affirm on the issues of bad act evidence and pro se representation, vacate the consecutive sentence, and remand for instatement of a concurrent federal sentence which reflects credit for time served.

*Affirmed in part; vacated and remanded in part.*

---

**7.** Prior to 1987, authority to grant credit for time served was vested in the Attorney General, 18 U.S.C. § 3568, who in turn delegated that power to the Bureau of Prisons. 28 C.F.R. § 0.96. Section 3568, however, was repealed and replaced by 18 U.S.C. § 3585 which makes no reference to the Attorney General. We agree with the Sixth Circuit that the omission "reflects a congressional intent to withdraw its thereto-fore delegation to the Attorney General" and vest the power henceforward in the district court. *See United States v. Wilson,* 916 F.2d 1115, 1118 (6th Cir.1990) (finding it noteworthy that section 3585(b)(2) was incorporated into 18 U.S.C. ch. 227 which delegates the authority to impose sentence, including the duty to calculate and credit presentence custodial time, upon the trial judge).